STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION v. HAYWOOD ELECTRIC MEMBERSHIP CORPORATION, BLUE RIDGE ELECTRIC ASSOCIATION, INCORPORATED, THE TOWN OF BRYSON CITY, THE FIVE-COUNTY COMMITTEE FOR T.V.A. POWER, THE COUNTY OF SWAIN, THE TOWN OF WEBSTER, THE COUNTY OF CHEROKEE, THE EASTERN BAND OF CHEROKEE INDIANS, THE WEST MACON GRANGE, THE SOUTH MACON GRANGE, IOTLA GRANGE, THE TOWN OF ANDREWS, ROBBINSVILLE GRANGE #1161, STECOAH GRANGE #1202, AND THE TOWN OF ROBBINSVILLE.

(Filed 19 July 1963.)

1. **Utilities Commission § 9—**

An order of the Utilities Commission must be predicated upon a finding of all the facts essential to a determination of the question in issue in order to permit a proper judicial review of its order. G.S. 62-26.3, G.S. 62-26.10.

2. **Same; Electricity § 2— Commission held to have failed to find facts essential to support order approving sale of power facilities.**

An order of the Utilities Commission granting a power company authority to sell its generating and transmission facilities to another power company and to abandon its obligations to the public under its certificate of public convenience and necessity upon the completion of the transfer, upon findings to the effect that the selling company was small and that it was not economically feasible for it to provide the increase in quantity of energy which its customers would need in the immediate future and

that the purchasing company could provide all energy needed in the foreseeable future and render more efficient service at less cost to the public than the selling corporation, must be set aside when there are no findings of fact supporting the conclusion that the cost of acquiring or constructing additional facilities by the selling corporation would be greater than economically feasible, and no findings in the record upon the evidence tending to show that the selling corporation could easily acquire additional energy for future expansion by purchase, exchange, and interchange of energy with other power companies, one of which was connected with TVA, etc.

**3. Electricity § 2;   Utilities Commission § 1—**

A public service corporation operating under a certificate of public convenience and necessity may not be allowed to abandon its obligations to provide the authorized service to the public unless it establishes that the public no longer needs the service it was created to render, or that there is no reasonable probability of its being able to realize sufficient revenue to meet its expenses in the rendition of such service. G.S. 62-96.

**4. Appeal and Error § 49—**

A failure to find facts essential to the determination of the rights of the parties necessitates a remand of the cause to the fact finding agency.

APPEAL by protestants from *McKinnon, J.,* February 11, 1963 Civil Term of ALAMANCE.

In 1961 Duke Power Company (Duke) and Nantahala Power & Light Company (Nantahala) filed a joint application with the North Carolina Utilities Commission (Commission) seeking: (1) approval of a contract by Nantahala to sell at its depreciated cost ($4,000,000 when the petition was filed) to Duke with authority to Duke to operate: (a) all of Nantahala's distribution facilities in the six counties in which Nantahala operates, (b) all of Nantahala's transmission lines in those counties "except its 161-kv line extending from its interconnection with Tapoco, Inc. to its Thorpe hydroelectric generating plant; and its 66-kv line extending from its Thorpe Plant to its Tennessee Creek hydroelectric generating plant." (c) Nantahala's Bryson, Dillsboro, and Franklin hydroelectric generating plants having a total capacity of 2,245 kw, (d) "all of its substations, line terminals, circuit breakers, relays and other related facilities, except those necessary for the operation of the generating plants and transmission lines being retained by Nantahala Power and Light Company," (e) miscellaneous real and personal property; and (2) authorization to Nantahala "to abandon the operation of its electric distribution system in the area it now serves and the transmission and generating facilities herein described, upon the commencement of operations by Duke Power Company."

The authorization requested is predicated upon allegations that: Duke, a large utility company is qualified to provide adequate, efficient, and dependable electric service in the area presently served by Nantahala; Nantahala, a relatively small public utility, operates hydroelectric plants which have a peak capacity of approximately 42,200 kw, not sufficient to take care of the demand expected by 1965; Nantahala is without funds to provide the additional generating capacity needed by 1965; if permission is granted to Duke to purchase, it will assume operation of the distribution system serving all of the customers of Nantahala except Aluminum Company of America (Alcoa) and will continue in effect Nantahala's current rate schedule for a period of three years from the date of acquisition.

Haywood Electric Membership Corporation, created pursuant to G.S. 117-6 *et seq.*, Blue Ridge Electric Association, a Georgia corporation doing business in this state, Bryson City, Webster, Andrews, and Robbinsville, municipal corporations, Swain and Cherokee Counties, Eastern Band of Cherokee Indians, Five-County Committee for TVA Power, West Macon Grange, South Macon Grange, Iotla Grange, Robbinsville Grange #1161 and Stecoah Grange #1202, unincorporated associations (all collectively designated as protestants), as customers of Nantahala, sought permission and were permitted to intervene in opposition to the authorization sought. Their answers question the desirability of permitting Duke to serve the territory now served by Nantahala. Additionally they allege the permission sought by Nantahala to divert the energy developed by its hydroelectric plants from public to private use would constitute a distinct disservice to the public.

Hearings were held. The Commission, by majority vote, made "findings of fact" and on these findings it reached "conclusions." Based on the findings and conclusions, it granted Nantahala authority to sell, Duke authority to purchase and operate in the described territory upon condition that Nantahala's rates in effect when the application was filed should continue in effect for a period of three years after the acquisition, unless changed by order of the Commission, and gave Nantahala permission "to abandon its obligation to serve the public in the area involved under its Certificate of Public Convenience and Necessity upon the completion of the transfer of the properties and the beginning by Duke Power Company of the service hereinabove authorized."

Commissioner Eller filed a lengthy dissent, taking issue with the findings and conclusions made. He set out in detail additional facts he thought established by the evidence and necessary for a decision.

Protestants appealed to the Superior Court.

The Superior Court overruled each of protestants' exceptions and affirmed the order of the Commission.

*E. B. Whitaker, Lacy H. Thornburg, Vaughan S. Winborne, and William T. Crisp for potestant appellants.*

*Carl Horn, Jr., General Counsel Duke Power Company and Joyner and Howison by R. C. Howison, Jr., for Nantahala Power and Light Company.*

RODMAN, J. Art. 2, c. 62 of the General Statutes prescribes the procedure in matters before the Commission. As a part of that article, G.S. 62-26.3 requires: "All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include (1) findings and conclusions and the reasons or basis therefor upon all the material issues of fact, law, or discretion presented in the record, and (2) the appropriate rule, order, sanction, relief, or statement of denial thereof."

The Commission's findings, summarized or quoted, follow: (1) Notice of the time fixed for the hearing was published; (2) and (3) Nantahala and Duke are public utilities engaged in generating, transmitting, distributing, and selling electric current and energy; (4) a description of the properties as set out in the application; (5) the price to be paid; (6) the date when the sale will become effective; (7) the area in which Nantahala now operates, which Duke will serve if the sale is approved; (8) the dates when the four hydroelectric plants which Nantahala proposed selling were built and the dates when the seven plants which it proposed retaining were built; (9) "That from the combined capacities of the aforesaid plants Nantahala has a dependable capacity of 41 megawatts; that the plants are, of course, under favorable conditions capable of producing more electricity than 41 megawatts; that they have at one time produced a peak capacity of 42 megawatts; that Nantahala has approximately 16,600 customers; that for the calendar year of 1960 these customers used approximately 460 millions kwh of electricity; that it is necessary, in order to serve its public utility customers, that Nantahala have sufficient primary dependable power to meet these requirements; that Nantahala's public utility customers' use of electric energy has been increasing over the past years; that, by projecting this increase at a reasonably anticipated rate of increase into the future, Nantahala estimates that its present dependable power capacity will carry it through

the year 1965; that after the year 1965 it will not have sufficient generating facilities to enable it to produce dependable power in sufficient capacity to supply the needs and requirements of its public utility customers; that Nantahala has made studies and estimates looking toward the acquiring of additional land for and the construction of additional hydroelectric generating facilities so as to enable it to meet its anticipated requirements; that, from these studies and estimates, it appears that the cost of acquiring and constructing the additional facilities necessary will be greater than economically feasible"; (10) Duke presently serves an area of approximately 20,000 square miles with a population of 2,900,000; its lines extend into Transylvania County where it serves the towns of Brevard and Rosman; it has 12,700 acres of land in the southwest part of Transylvania County which can be used in the future for a hydroelectric generating plan; Duke is interconnected with Carolina Power & Light, Virginia Electric & Power, and South Carolina Electric & Gas; these connections lend strength to each of the utilities; Duke proposes to construct a transmission line into the Nantahala area if the sale is approved and "can put electric current and energy into the area economically and at reasonable rates;" (11) Duke is qualified and financially able to fulfill all its obligations; (12) neither Duke nor any other public utility company has offered to purchase the remaining hydroelectric generating plants of Nantahala; (13) it is Duke's policy to advertise the services it can render; (14) "That it will be in the public interest for Duke to acquire from Nantahala its distribution lines, generating facilities and properties, as hereinbefore set out, and operate them, serving the public in the area now served by Nantahala."

After stating protestants' contention that Nantahala, a public service corporation, authorized to exercise the power of eminent domain, could not turn its back on the public and deliver all the power it generates to its sole stockholder, Alcoa, the Commission said: "The nature of hydroelectric generating plants being what it is, it would seem logical to assume that Nantahala owns in fee simple the lands on which these plants and their storage lakes and ponds are situate. Except for the inference implied by the statutory authority conferred upon all public utilities, the record is void of any competent evidence which would support a finding of fact that any particular tract of land was acquired for these purposes by the use, or threat of use, of the power of eminent domain. . .The law applicable to abandonment of easements acquired by eminent domain is different from that which applies to lands acquired in fee."

The Commission concluded "the sale and transfer will be in the public interest," the sale should be approved, and when consummated Nantahala "should be relieved of its obligation to serve and should be permitted to abandon its Certificate of Public Convenience and Necessity."

The exceptions and assignments of error raise these questions: (1) Has the Commission found facts as required by G.S. 62-26.3? (2) Is the Commission's order based on a misinterpretation of the law applicable to the facts of the case?

The Commission is required by G.S. 62-26.3 to find all facts essential to a determination of the question at issue. Having found the facts, it may then make factual conclusions. *Utilities Com. v. State and Utilities Com. v. Telegraph Co.*, 239 N.C. 333, 80 S.E. 2d 133, 43 Am. Jur. 718. The reason for compelling adequate factual findings is to permit proper judicial review. G.S. 62-26.10.

The duty imposed by G.S. 62-26.3 is similar to the duty imposed on a judge of the Superior Court by G.S. 1-185 when a jury trial is waived, and on the Industrial Commission by G.S. 97-84 before it can award or deny compensation.

*Bobbitt, J.,* speaking with reference to the duty imposed by G.S. 97-84, said in *Guest v. Iron & Metal Co.*, 241 N.C. 448, 85 S.E. 2d 596: "Specific findings of fact by the Industrial Commission are required. These must cover the crucial questions of fact upon which plaintiff's right to compensation depends. (Citing authorities). Otherwise, this Court cannot determine whether an adequate basis exists, either in fact or in law, for the ultimate finding as to whether plaintiff was injured by accident arising out of and in the course of his employment."

The reasons assigned to secure approval of the sale and release of Nantahala from its obligation to the public are twofold: (1) Nantahala, a small company, does not have and cannot economically provide the energy which the public in its service area will in the near future demand. (2) Duke, an electrical giant, has an abundance of power. It can provide all electricity which is now or may be needed in the foreseeable future. Not only does it have adequate power but it can render more efficient service at less cost to the public than Nantahala can.

As said by the Commission, protestants do not challenge Duke's ability to meet public demand. What protestants say is Nantahala can meet the demand and do so at less cost to the public than the service would cost if rendered by Duke.

To support their contention protestants point to the evidence of applicants to establish these facts:

(1) COST OF SERVICE: Duke, while possessing large water power, depends primarily on steam to generate electricity, using its hydroelectric power during short periods of peak demands. As a result it cost Duke 12.138 mills per kw for electricity generated in 1960. Nantahala, relying exclusively on water power, generated electricity at a cost of 7.8 mills per kw. Thus the commodity each had for sale cost Duke nearly half a cent more than it cost Nantahala. Nantahala now has the facilities necessary to transmit the current it generates to its distribution system. Duke, on the other hand, will have to build a transmission line connecting its generating plants with the distribution system which Nantahala wishes to sell. This new transmission line will cost Duke $2,226,000.

(2) NANTAHALA'S ABILITY TO SERVE: Mr. Archer, Nantahala's vice president, testified: "Hydroelectric plants produce both primary energy, which is completely dependable, and secondary energy, which is not dependable. This is due to the fact that streamflows vary from year to year and the amount of electricity which can be generated is dependent entirely upon the amount of water flowing into the reservoirs. In order for the energy to be primary, it must be that energy which can be produced in times of lowest stream-flow. Only primary energy is used by our customers other than Alcoa. All of the secondary generation, and that part of the primary generation which is left after all our other customers are served, is taken and paid for by Alcoa whether it can use this generation or not."

Nantahala's witness Phillips testified that he made studies of stream flows affecting Nantahala's plant for the period from 1924 to 1960, both inclusive. He testified: "We concluded that stream flows experienced during the 18-month period from June 1930 through November 1931 represented the most adverse period of record or the 'critical period' as it is usually termed. This 18-month period is the period in which the sum of the energy from stream-flow and the energy from storage produces the minimum monthly energy supply available from Nantahala's plants. In all other months of the thirty-six year period, the available energy would be equal to or greater than the monthly generation available during the critical period." He concluded that during this 18-month period Nantahala had a total generating capacity of 540,000,000 kwh or an average of 30,000,000 kwh per month. "Since the generation of a group of hydroelectric plants

during the critical period represents its assured supply of energy—usually referred to as its supply of primary energy—the primary energy of the Nantahala system is 360 million kilowatt-hours per year." He further testified: "I have spent my lifetime on water problems and I think the probability of a lower water period is always present as you have a cycle of about 150 years between minimum water."

Protestants inquire: Is it proper to find that Nantahala's dependable capacity is limited to 41 megawatts because once in a thirty-six-year period the stream flow would have produced only that quantity, particularly in view of the fact that these adverse conditions occur in cycles approximating 150 years apart?

Nantahala's kwh sales to the public and to its parent during the period 1941-1960 are shown in the following tabulation:

| YEAR | KWH SALES PUBLIC | ALCOA |
|------|------|------|
| 1941 | 25,984,275 | 28,525,000 |
| 1942 | 15,624,515 | 224,605,383 |
| 1943 | 16,493,930 | 320,776,268 |
| 1944 | 18,816,597 | 205,616,125 |
| 1945 | 28,155,912 | 205,500,700 |
| 1946 | 23,092,921 | 296,697,964 |
| 1947 | 26,542,909 | 277,882,600 |
| 1948 | 31,924.079 | 259,283,160 |
| 1949 | 37,436,526 | 376,799,145 |
| 1950 | 54,869,704 | 378,183,840 |
| 1951 | 63,423,669 | 274,107,200 |
| 1952 | 77,204,105 | 322,902,800 |
| 1953 | 88,653,730 | 199,706,760 |
| 1954 | 90,742,310 | 265,448,248 |
| 1955 | 115,735,461 | 257,318,132 |
| 1956 | 122,938,976 | 183,203,452 |
| 1957 | 125,253,483 | 355,560,020 |
| 1958 | 137,948,583 | 328,132,000 |
| 1959 | 158,937,298 | 203,507,964 |
| 1960 | 172,451,768 | 256,808,780 |

Mr. Philips further testified: "In an average year the energy generated will amount to 439 million kilowatt-hours per year." This is 50

megawatts, 22% greater than the "dependable capacity" found by the Commission.

Nantahala does not propose shedding its duty to the public because the service it undertook to render is no longer needed. It seeks to do so upon the hypothesis that there is no reasonable probability of its being able to realize sufficient revenue from the services rendered to meet its expenses, contending the Commission's finding "that Nantahala has made studies and estimates looking toward the acquiring of additional land for and the construction of additional hydroelectric generating facilities so as to enable it to meet its anticipated requirements; that from these studies and estimates, it appears that the cost of acquiring and constructing the additional facilities necessary will be greater than economically feasible" is sufficient to meet the statutory condition for abandonment. G.S. 62-96.

We are not certain whether the Commission meant Nantahala had concluded the cost of acquiring and constructing the additional necessary facilities "would be greater than economically feasible," or whether that was the conclusion reached by the Commission from the evidence. In either event it is a mere conclusion. There are no facts found by the Commission on which to base the conclusion.

The evidence to which the Commission refers with respect to the cost of additional hydroelectric power comes from Nantahala's officials. They refer to two sites available to Nantahala for further development, one known as Wesser, the other as Needmore. The latter is the larger of the two, and cost of energy generated there will be less than at Wesser.

Needmore would have a capacity of 118,000,000 kwh of "primary energy." The estimated cost of generating electricity at that site is 13.3 mills per kw as compared with Nantahala's present cost of 7.8 mills per kw and Duke's cost of 12.138 mills per kw. While it would cost more to generate electricity at Needmore that it costs Duke, seemingly the cost of electricity generated by the present plants and Needmore would average less than 10 mills per kw—2 mills less than Duke's cost. The Commission has not interpreted nor made findings based on this testimony.

The mere fact, as the Commission seems to have assumed, that additional hydroelectric power would be unduly expensive (if such is the case) would not suffice to relieve Nantahala of the responsibility of seeking other sources so as to assure necessary supplementary power during periods of abnormally low stream flow.

The evidence is that Alcoa, sole stockholder of Nantahala and Tapoco, Inc., an owner of hydroelectric plants in this state, entered

into a contract with TVA in 1941 which has since been amended and supplemented. The subsidiaries of Alcoa, by virtue of this agreement (called the Fontana Agreement), sell (in the language of the contract, "exchange") all the electricity they produce. The electricity "exchanged" is paid for by "interchange electricity."

The public has the first claim on all power generated by Nantahala. *Utilities Com. v. Mead Corp.*, 238 N.C. 451, 78 S.E. 2d 290. Would not TVA, in recognition of this sound legal principle, consent to rearrange the "exchange" and "interchange" of power so as to assure Nantahala's getting such additional power as it might need in periods of emergency created by abnormally low stream flow? It is stated in one of the exhibits offered by applicants: "TVA had a variety of contractual relations with fourteen privately owned utility companies and one generation and transmission cooperative. The contracts with these utilities provide for interconnection of facilities for interchange, sale and purchase of power, for emergency standby services, or various combinations of these." We find nothing to indicate this field has been explored.

Commissioner Eller in his dissenting opinion refers to Tapoco, Inc. as a public utility with a surplus of primary power. It is already connected with TVA and with Nantahala. If in fact Tapoco has power not used to serve the public, should that power not be made available to Nantahala and other utility companies in emergencies to meet the public demand?

Nantahala's officials also testified to negotiations with Duke Power Co. and Carolina Power & Light Co. with respect to supplementing Nantahala's "primary energy" when needed. Again the Commission made no findings with respect to this important phase of the case.

The Commission said: "The law applicable to abandonment of easements acquired by eminent domain is different from that which applies to lands acquired in fee." Assuming the foregoing statement of law to be correct, we are unable to relate it to the right of Nantahala to cease serving the public.

A corporation created by governmental authorization for the purpose of serving the public at a profit to itself should be given wide latitude in estimating the extent to which the public will call on it for service, and no order should be made which will thwart it in the performance of its duty to the public; but when a corporation which has accepted the state's grant of authority to acquire property for use in serving the public seeks to relieve itself of the responsibility imposed when it accepted its charter, a different and more stringent rule must be applied. The Legislature has so declared. It must es-

tablish that the public no longer needs the service which it was created to render or that there is no reasonable probability of its being able to realize sufficient revenue by the rendition of such service to meet its expenses. G.S. 62-96. As said by Barnhill J. (later C.J.), in *Sinclair v. R.R.*, 228 N.C. 389, 45 S.E. 2d 555: "While a public utility such as a railroad retains its franchise, it owes to the State and the public the duty of continuous operation." *Utilities Com. v. R.R.*, 254 N.C. 73, 118 S.E. 2d 21; 43 Am. Jur. 621.

A failure to find facts essential to a determination of the rights of the parties necessitates a remand to the person or agency charged with that responsibility. *Jamison v. Charlotte*, 239 N.C. 423, 79 S.E. 2d 797; *Woodard v. Mordecai*, 234 N.C. 463, 67 S.E. 2d 639; *Shore v. Bank*, 207 N.C. 798, 178 S.E. 572.

Because the Commission has failed to find essential facts and may have misinterpreted the law, the judgment of the Superior Court is reversed with directions to the Superior Court to remand to the Utilities Commission to make necessary findings and conclusions on which it may base its order.

Reversed and remanded.