STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION, AND GREYHOUND LINES, INC., APPLICANT, AND SECRETARY OF THE ARMY, INTERVENOR, v. QUEEN CITY COACH COMPANY AND FORT BRAGG COACH COMPANY, PROTESTANTS

No. 6910UC109

(Filed 2 April 1969)

**1. Carriers § 2; Utilities Commission § 7— what constitutes public convenience and necessity**

What constitutes public convenience and necessity is primarily an administrative question with a number of imponderables to be taken into consideration, e.g., whether there is a substantial public need for the service, whether the existing carriers can reasonably meet this need, and whether it would endanger or impair the operations of existing carriers contrary to the public interest.

**2. Carriers § 2— granting of certificate to common carrier — rights of existing carrier**

If the proposed operation under the certificate sought would seriously endanger or impair the operations of existing carriers contrary to the public interest, the certificate should not be issued.

**3. Utilities Commission § 1— procedure — findings of fact**

The Utilities Commission is required to find all facts essential to a determination of the question at issue. G.S. 62-79.

**4. Carriers § 2— application for franchise certificate — impairment of existing carrier services — findings of fact**

In a hearing wherein the Utilities Commission granted application by a common carrier for a franchise certificate, failure of the Commission to make findings of fact (1) as to whether the granting of the application would endanger or impair the operation of an existing carrier contrary to the public interest and (2) as to whether the existing carrier can rea-

sonably meet the public needs, *is held* error, since the existing carrier alleged, and offered supporting evidence, that the granting of the application would adversely affect its profitable charter bus operations and thereby cause it to discontinue a needed commuter bus service between a military base and a nearby city.

APPEAL by protestants, Queen City Coach Company and Fort Bragg Coach Company, from final order of the North Carolina Utilities Commission dated 31 July 1968.

For purposes of brevity the parties to this proceeding will be referred to as "Greyhound" denoting Greyhound Lines, Inc.; "Army" denoting Secretary of the Army, Intervenor; "Queen" for Queen City Coach Company, and "Fort Bragg Coach" denoting Fort Bragg Coach Company.

Greyhound on 13 March 1967 filed an application with the North Carolina Utilities Commission (hereinafter referred to as "Commission") seeking a common carrier franchise certificate to operate from Fayetteville over N.C. Highway 87 to Fort Bragg; thence over S.R. 1613 to its junction with S.R. 1600; thence over S.R. 1600 to its junction with S.R. 1611; thence over S.R. 1611 to its junction with U.S. Highway 401, serving all intermediate points with a restriction that "no passenger is to be transported whose entire ride is between Fayetteville and Fort Bragg, North Carolina."

Queen and Fort Bragg Coach, a wholly owned subsidiary of Queen, filed a joint protest on 18 May 1967 and an amended protest on 1 September 1967. The allegations of Queen and Fort Bragg Coach pertinent to this appeal are, in summary, that Queen is certificated to serve the route between Greensboro and Fayetteville over N.C. Highway 87 between Jonesboro (Sanford) and Fayetteville through Fort Bragg which route has been adequately served to meet the requirements of public convenience and necessity; that Queen is certificated to serve the route between Lillington and Fayetteville over N.C. Highway 210 through Fort Bragg and that route has been adequately served by Queen for many years to meet the requirements of public convenience and necessity; that Queen is certificated to serve the route between N.C. Highway 210 at its junction with S.R. 1613 and thence over S.R. 1613 to its junction with S.R. 1600 and thence by various county roads to N.C. Highway 59 and over N.C. Highway 210 and return, which route is now being served by Queen even though in its opinion public convenience and necessity do not require the service; that Fort Bragg Coach is certificated to serve only the route between Fayetteville and Fort Bragg via N.C. Highway 87 and that route has been adequately

served for many years by Fort Bragg Coach to meet the requirements of public convenience and necessity; that the Greyhound application duplicates the franchise routes of Queen and Fort Bragg Coach for the entire distance between Fayetteville and Fort Bragg and the franchise route of Queen for the entire distance between Fort Bragg and Eureka Springs over S.R. 1613; that public convenience and necessity do not require the granting of the rights sought by Greyhound; that Queen and Fort Bragg Coach are rendering adequate service on N.C. Highway 87; that Queen is rendering service on the route on S.R. 1613 between Fort Bragg and the junction thereof with S.R. 1600 more than adequate to meet any requirements of public convenience and necessity; that the granting of the application would result in financial detriment to Queen and Fort Bragg Coach for that "(i) It would permit Greyhound Lines, Inc. to engage in competitive schedule service to these protestants over routes heretofore certificated by this Commission to these protestants and between points served by protestants over N.C. Highway 87 and Cumberland County Highway 1613 and other highways duly certificated to Queen City Coach Company, thereby diverting business from protestants to applicant Greyhound Lines, Inc. with consequent loss of revenues to protestants; (ii) It would permit Greyhound Lines, Inc. to originate charter service from Fort Bragg to any place in this State in direct competition with the charter service authority of these protestants, thereby diverting business to Greyhound Lines, Inc. with consequent revenue loss to these protestants"; that the granting of the application "with the diversion of schedule and charter traffic to applicant which would follow therefrom would adversely affect protestants' ability to render service to the public"; that protestants are ready, willing, and able to provide any additional service over their authorized routes that may become necessary to meet the reasonable needs and requirements of the traveling and shipping public.

On its petition, Army was permitted to intervene as its interests might be made to appear.

The matter was heard by the Full Commission on 19-22 September 1967, and on 31 July 1968, the Commission entered its order granting the application, Commissioner Biggs dissenting.

Protestants, in apt time, filed their exceptions and notice of appeal.

.

*Joyner, Moore & Howison by R. C. Howison, Jr., and Nance, Collier, Singleton, Kirkman & Herndon by James R. Nance for protestant appellants.*

*Bailey, Dixon & Wooten by Ruffin Bailey for appellant appellee.*

*Edward B. Hipp and Larry G. Ford for the Utilities Commission.*

MORRIS, J.

The order of the Commission contained the following findings of fact and conclusions:

"1. That Greyhound is a common carrier holding a franchise certificate to transport passengers, their baggage, mail and light express over various routes in intrastate commerce and interstate commerce in North Carolina and in other States, and that it has the equipment necessary and is fit, willing and able to provide the facilities necessary to properly perform the proposed service; that it is solvent and financially able to furnish adequate service such as is proposed on a continuing basis.

2. That Greyhound has applied for interstate authority which would be identical to that sought in this application; however, it does not intend to transport any passengers whose transportation is limited solely to movement between Fort Bragg and Fayetteville, North Carolina.

3. That Fort Bragg is a large military installation with its own shopping centers, banks, motels, schools and housing facilities and has a base population equal to or in excess of the population of Fayetteville, North Carolina.

4. That Greyhound proposes to serve Fort Bragg on its north-south schedule routes, proceeding south over U.S. Highway 401 to a junction with County Road 1611 and over County Road 1611 to the Fort Bragg Bus Station; from there it would go over N.C. Highway 87 into Fayetteville Bus Station and then proceed south over U.S. Highway 401. By this route it would serve not only Fort Bragg, but also passengers at Eureka Springs, North Carolina, a small community just east of Fort Bragg, as an intermediate point along this route. For northbound traffic the route would be the reverse of the foregoing description. Until September 1, 1967, there was no intrastate service operating to or from Eureka Springs, North Carolina. Although Queen has held a certificate to serve Eureka Springs since the 23rd day of

September, 1964, it had never offered service to or from Eureka Springs until September 1, 1967, after the interstate hearing and immediately prior to the prehearing conference in this particular docket, at which time it instituted a schedule offering service for the first time to Eureka Springs.

5. That the Fort Bragg Military Reservation is approximately 3½ to 4½ miles from the city limits of Fayetteville at its closest point along N.C. Highway 87. The proposed route amounts to an increase of approximately twelve miles to the present route operated by Greyhound and approximately twenty minutes to Greyhound's present time schedule. Greyhound is presently providing intrastate and interstate passengers with service to and from the Fort Bragg installation which requires its passengers to use other means of transportation from that installation to Fayetteville. The proposed service will eliminate the interline of passengers between the local bus service and the Greyhound bus service and will be a convenience to the passengers as well as better meet their needs for travel to and from the Fort Bragg installation.

## CONCLUSIONS

1. The preponderance of the evidence leads this Commission to the conclusion that there is a need for the service as proposed by Greyhound in this case, with the exclusion or restriction as set forth in its application; that the testimony of the witnesses, including that of the Director of Services at Fort Bragg, has amply pointed up the fact that there is a need for the service between Fort Bragg and Eureka Springs and various points and places, including Wagram, Raleigh, Linden, Lillington, Durham, and other intrastate points in North Carolina.

2. Greyhound has borne the statutory burden of proof and has established to the satisfaction of the Commission that there is a public demand and need for the common carrier service proposed in the territory proposed in addition to the existing authorized service.

3. Greyhound has borne the burden of proof and has established that it is fit, willing and able to properly perform the proposed service.

4. Greyhound has borne the burden of proof and the protestants have stipulated that it is solvent and financially able to furnish adequate service on a continuing basis.

5. The route between Eureka Springs and Fayetteville via Fort Bragg although authorized for service is not being served

and was not served by Queen until after this application was filed and just prior to the prehearing conference, and protestants Queen and Fort Bragg Coach still contend there is no need for the service which it had so recently instituted though for many years it had abandoned.

6.   Greyhound should be restricted as proposed in the application in order that no passenger is to be transported whose entire ride is between Fayetteville and Fort Bragg, North Carolina."

At the outset, it is to be noted that Greyhound has not applied for authority to operate the shuttle type service from Fort Bragg to Fayetteville and return, which service is presently furnished by Fort Bragg Coach by buses traveling throughout the military reservation.

The uncontroverted evidence in this case is that Greyhound proposes to divert some of its interstate North-South buses by way of Fort Bragg, from its shorter and direct North-South route over U.S. Highway 401. The proposed service of Greyhound would be a rerouting of five of its through northbound buses and four through southbound buses. The northbound buses going to Raleigh would leave Fort Bragg at 1:30 a.m., 4:35 a.m., 7:00 a.m., and 8:45 p.m. The southbound buses leaving Raleigh for Fort Bragg would arrive at Fort Bragg at 2:45 a.m., 8:50 a.m., 11:40 a.m., 3:10 p.m., and 7:00 p.m. The Fort Bragg Coach makes 56 round trips daily between Fort Bragg and Fayetteville over N.C. Highway 87. These two points are approximately 3½ miles apart. The population of Fort Bragg exceeds 58,000 persons. Military personnel living on Fort Bragg, in some cases, live as much as 4 miles from the Fort Bragg bus station; however, Fort Bragg Coach buses run throughout the military reservation; therefore, it is not necessary to go to the Fort Bragg bus station to get a bus to Fayetteville. This service is furnished every half hour, day and night. It is necessary for passengers going to Raleigh or Durham or other points to change buses at Fayetteville. Queen, Fort Bragg Coach and Greyhound all operate out of Fayetteville bus station. Queen also has flag stop service from Fort Bragg to Raleigh. There is also uncontroverted evidence that Queen is furnishing service to the residents of Eureka Springs into Fayetteville which service has been effective since 1 September 1967 although Queen has held a certificate for that route for many years.

Greyhound offered evidence from military personnel tending to show that through service to Raleigh and Durham and other points in North Carolina would be desirable without the necessity of chang-

ing buses in Fayetteville. There was some evidence that it was necessary to wait at various bus stops on the base for a Fort Bragg Coach bus to Fayetteville. Not all of the witnesses were familiar with the schedules proposed by Greyhound and only a few of those familiar with the proposed schedule testified that any bus on that schedule would be convenient for them. Greyhound also offered evidence from residents of Eureka Springs that bus service to Fayetteville, and to towns and communities north of Eureka Springs would be of convenience to them.

Greyhound's evidence was that the diversion of its buses from U.S. Highway 401 into Fort Bragg and to Fayetteville would require 12.5 miles additional travel for those through passengers on the bus and would require approximately 20 minutes additional travel time.

Protestants' evidence was that the additional travel time for each schedule proposed by Greyhound would be a minimum of 39 minutes based on an actual trial run. Protestants also presented military personnel who testified that they had had no difficulty in getting from Fort Bragg to Fayetteville or return with the present facilities and had no need or desire for through transportation from the Fort Bragg bus station to Raleigh or Durham or other points in North Carolina. There was also testimony that no complaint had been registered from enlisted personnel at Fort Bragg. The vice-president in charge of traffic for Queen and Fort Bragg Coach testified that there were 87 company buses stationed in Fayetteville, 10 of which are used in the regular Fayetteville-Fort Bragg service. The remainder are used for extra buses and charter service. That dispatches with radio equipment are employed to get extra equipment when needed and a standby bus and driver are always ready. Five buses are available on 30-minute notice. He further testified that Fort Bragg Coach showed a loss of $180,265 for the first eight months of that year in providing the Fayetteville-Fort Bragg service, the return being 32¢ per mile and the cost 48.9¢ per mile. He testified further that the company had been willing to sustain the loss in operating the shuttle bus to Fayetteville on a frequent basis because of the revenues derived from the volume of charter service, but that if Greyhound's application for originating service on the base be approved it would claim one-half of the charter service and he could not say how long his company could continue furnishing the shuttle service at a loss. Protestants testified that they would provide such additional trips from Fort Bragg to Raleigh as might be ordered by the Commission or as might be requested by the Army.

We turn now to the statutory requirements we think pertinent.

G.S. 62-262(e) provides that if the application filed with the Commission is for a certificate the applicant shall have the burden of proof of showing to the satisfaction of the Commission:

"(1)　That public convenience and necessity require the proposed service in addition to existing authorized transportation service, and

(2)　That the applicant is fit, willing and able to properly perform the proposed service, and

(3)　That the applicant is solvent and financially able to furnish adequate service on a continuing basis."

From the record before us, it appears that there is no serious contention that Greyhound has failed to sustain its burden of proof as to (2) and (3). Protestants, however, seriously contend that the conclusion of the Commission that Greyhound has borne the statutory burden of proof as to (1) is erroneous for that it is not supported by the findings of fact.

G.S. 62-79 provides that "All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include: (1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and (2) [not applicable to this appeal]."

Protestants by their answer to the application filed by Greyhound particularly alleged that the granting of the application would result in financial detriment to them and adversely affect their ability to render service to the public. Evidence was presented in support of this contention. They also alleged that they were well able reasonably to meet the needs of the traveling public and willing and able to furnish such additional service as might be required. Evidence was presented on this contention.

[1]　Our Supreme Court has said many times that "what constitutes 'public convenience and necessity' is primarily an administrative question with a number of imponderables to be taken into consideration, *e.g.*, whether there is a substantial public need for the service; whether the existing carriers can reasonably meet this need, and whether it would endanger or impair the operations of existing carriers contrary to the public interest." *Utilities Commission v. Trucking Co.*, 223 N.C. 687, 28 S.E. 2d 201; *Utilities Commission v. Ray*,

236 N.C. 692, 73 S.E. 2d 870; *Utilities Commission v. Coach Co. and Utilities Commission v. Greyhound Corp.*, 260 N.C. 43, 132 S.E. 2d 249.

**[2]** We are not inadvertent to the fact that the factors denominated as imponderables, to wit: whether the existing carriers can reasonably meet the need for the service and whether the granting of the application would endanger or impair the operations of existing carriers contrary to the public interest, are not solely determinative of the right of the Commission to grant the application. Both are directed to the question of public convenience and necessity. *Utilities Commission v. Coach Co.*, 233 N.C. 119, 63 S.E. 2d 113. Nevertheless, if the proposed operation under the certificate sought would seriously endanger or impair the operations of existing carriers contrary to the public interest, the certificate should not be issued. *Utilities Commission v. Coach Co., supra.*

**[3]** The Commission is required by G.S. 62-79 to find all facts essential to a determination of the question at issue. *Utilities Commission v. Membership Corporation*, 260 N.C. 59, 131 S.E. 2d 865. Rodman, J., in the last cited case pointed out the fact that the duty imposed by this statute (then G.S. 62-26.3) is similar to that imposed upon a trial judge by G.S. 1-185 when a jury trial is waived and on the Industrial Commission by G.S. 97-84 before an award or denial of compensation can be made. "Bobbitt, J., speaking with reference to the duty imposed by G.S. 97-84, said in *Guest v. Iron & Metal Co.*, 241 N.C. 448, 85 S.E. 2d 596: 'Specific findings of fact by the Industrial Commission are required. These must cover the crucial questions of fact upon which plaintiff's right to compensation depends. (Citing authorities) Otherwise, this Court cannot determine whether an adequate basis exists, either in fact or in law, for the ultimate finding as to whether plaintiff was injured by accident arising out of and in the course of his employment.'" *Utilities Commission v. Membership Corporation, supra.*

**[4]** The Commission's order in this case contains no finding of fact with respect to whether the granting of the application would endanger or impair the operations of existing carriers contrary to the public interest, nor is there a finding with respect to whether the existing carriers can reasonably meet the public needs.

We think that findings of fact with respect to these questions are particularly imperative to a conclusion and decision in this case. The pleadings and evidence presented indicate that the Fort Bragg charter service is at least a substantial part of this controversy. There seems to be no question but that the continuation of the Fort Bragg-

Fayetteville commuter service of Fort Bragg Coach on a frequent schedule basis is most desirable and necessary for the residents of the military installation. We are not able to determine whether the Commission considered these factors in reaching its decision.

There is a finding of fact that "Although Queen has held a certificate to serve Eureka Springs since the 23rd day of September, 1964, it had never offered service to or from Eureka Springs until September 1, 1967, after the interstate hearing and immediately prior to the rehearing conference in this particular docket, at which time it instituted a schedule offering service for the first time to Eureka Springs." There is also a conclusion that "The route between Eureka Springs and Fayetteville via Fort Bragg although authorized for service is not being served and was not served by Queen until after this application was filed and just prior to the prehearing conference, and protestants Queen and Fort Bragg Coach still contend there is no need for the service which it had so recently instituted though for many years it had abandoned." There was evidence that Queen was, at the time of the hearing, furnishing that service with no intent to abandon it, and we are unable to find any contradictory evidence in the record. We are unable to say whether this conclusion is the result of inadvertent phraseology or a misunderstanding on the part of the Commission as to whether the service had been abandoned. At any rate, we are not able to determine from the order of the Commission whether consideration was given to the two factors which we feel are crucial factors. For that reason, the matter must be remanded for findings of fact in accordance with this opinion.

Remanded.

CAMPBELL and BRITT, JJ., concur.