STATE OF NORTH CAROLINA EX REL UTILITIES COMMISSION; NORTH CAROLINA NATURAL GAS CORPORATION, APPLICANT; AND ALUMINUM COMPANY OF AMERICA, INTERVENOR v. FARMERS CHEMICAL ASSOCIATION, INC., PETITIONER

No. 7610UC825

(Filed 15 June 1977)

Gas § 1— supplier's purchase of emergency gas — no use by customer — surcharge imposed on customer — error

The Utilities Commission erred in finding and concluding that defendant, a nitrogen fertilizer manufacturer, was served or benefited from its gas supplier's purchase of emergency gas and in requiring that defendant pay a surcharge to cover the increased cost of the emergency gas where the evidence tended to show that defendant never agreed to purchase emergency gas and was willing to shut down when it had used up its allotment of existing gas, though that became unnecessary when the flow of gas to defendant's supplier unexpectedly increased, and defendant in fact never used any of the emergency gas purchased by its supplier.

APPEAL by petitioner, Farmers Chemical Association, Inc. from order of the North Carolina Utilities Commission entered 3 June 1976 in Docket No. G-21, Sub 148. Heard in the Court of Appeals 17 February 1977.

Farmers Chemical Association, Inc. owns a nitrogen fertilizer manufacturing complex located near Tunis, North Carolina. In its manufacturing process it requires 29,200 Mcf of natural gas per day. It has a twenty year contract for firm natural gas service with its sole supplier, North Carolina Natural Gas Corporation.

Farmers Chemical uses natural gas entirely for "feedstock" and "process" purposes, as a raw material that is converted into nitrogen fertilizer and as a super heating fuel to effectuate this conversion.

In recent years, there have been substantial curtailments in Transcontinental Gas Pipe Line Corporation's flowing volumes. Transco allocates gas to its customers, including North Carolina Natural Gas on a seasonal basis. The 1975-76 winter season ran from 16 November 1975 through 15 April 1976. In order to allocate the existing supply of gas, the Utilities Commission adopted a system of priorities. When a distribution

company does not have enough gas available to supply all its customers, those customers with the highest priorities will be supplied and those with the lowest will not. There are twenty priority classes, with classes R.1 and R.2 having the highest priority and class A having the lowest. In the winter of 1975-76 supplies of natural gas were inadequate and the priority system was put into effect.

On 22 December 1975 North Carolina Natural Gas Corporation (NCNG) filed an application with the Commission, in which it stated that it had obtained 1,441,362 Mcf of natural gas from Michigan Consolidated Gas Company (Michigan) at a cost of $1.89613 per Mcf. This was an emergency purchase designed to supplement the supplies of gas which NCNG received from its regular supplier, Transcontinental Gas Pipe Line Corporation (Transco). The price of the gas purchased from Michigan was higher than that of the gas which NCNG regularly received from Transco. To recover this additional cost, NCNG requested permission to impose a surcharge of 24.7¢ per Mcf on all gas sold to its customers, except gas used by residential customers and gas used for feedstock purposes by Farmers Chemical Association, Inc. (FCA).

In an order dated 6 January 1976, the Commission approved NCNG's proposed surcharge, but required NCNG to impose it on all gas sold to its customers except gas used by residential customers. On January 7 NCNG filed tariffs in accordance with the Commission's order. The tariffs were "effective for billings on or after January 7, 1976."

On 2 February 1976 FCA petitioned for reconsideration of the Commission's order of 6 January 1976. On 24 March 1976 the Commission held a hearing on FCA's petition. At the hearing FCA offered evidence tending to show that it operates a manufacturing plant in Tunis. At this plant it uses large quanties of natural gas, and a substantial portion of this gas is used for feedstock purposes—that is, as a raw material in the manufacture of other products. Because of the nature of its manufacturing process, FCA cannot operate without gas, and cannot operate when the gas supply is significantly below their total requirements. FCA cannot operate at a profit when the price of gas is as high as that paid by NCNG to Michigan for its emergency purchase. Because of this, FCA would prefer to close down rather than use high-priced emergency gas. On

Utilities Comm. v. Farmers Chemical Assoc.

6 November 1975 there was a meeting of NCNG and FCA offi-
cials. NCNG advised FCA that because of the nationwide gas
shortage, its regular supplies of gas from Transco had been
curtailed, and it probably would be unable to supply all of FCA's
gas requirements for the winter. Since FCA cou'd not signifi-
cantly reduce its daily use of gas, NCNG and FCA agreed that
FCA would operate until January 3 and then close down. On
February 12 FCA would reopen and operate until its available
gas for the winter was exhausted. NCNG officia's mentioned
the possibility of an emergency gas purchase, and FCA officials
stated that they could not afford to use high-priced emergency
gas and would rather close their plant. On 1 December 1975
NCNG notified FCA that it had made an emergency purchase
from Michigan, and on December 8 FCA wrote to NCNG re-
iterating that it had not desired or agreed to such a purchase.
During the winter NCNG received certain additional supplies of
gas from Transco, in excess of those it had expected to receive.
Because of these additional supplies from Transco and the emer-
gency purchase from Michigan, NCNG had enough gas to supply
all of FCA's requirements for the winter, and FCA did not have
to close down at any time. In fact, the additional supplies from
Transco alone were sufficient to supply all of FCA's require-
ments, and FCA would have been able to operate throughout the
winter even if there had been no purchase of emergency gas
from Michigan. FCA offered evidence tending to show that the
Utilities Commission had participated in a proceeding before
the Federal Power Commission, dealing with the prices to be
charged for emergency gas purchases. In this proceeding the
Utilities Commission advocated "rolled-in" pricing. Under the
system of rolled-in pricing, when a company purchases emer-
gency gas at a cost which is higher than the cost of its regular
gas supplies, the extra cost of the emergency gas is borne by all
of the company's customers.

NCNG offered evidence tending to show that it received
13,458,000 Mcf of natural gas from Transco in the winter of
1975-76, and this amount was sufficient to meet all of FCA's
requirements, without resorting to the emergency gas pur-
chased from Michigan. However, the emergency gas was neces-
sary in order to supply other customers of lower priorities.

The Commission staff offered in evidence a table showing
the distribution of natural gas received by NCNG in 1975-76,
Ex. 3. The table shows that NCNG received 13,458,000 Mcf

from Transco and 1,383,708 Mcf from Michigan, Ex. 3. Of this total amount, 1,118,760 Mcf were sold to customers of lower priority than FCA; 4,438,400 Mcf were sold to FCA; and 8,906,413 Mcf were sold to customers of higher priority than FCA, Ex. 3. The remaining 378,135 Mcf were used for purposes designated in the table as "Storage (Injection)" and "Company Use & Unacc. (2%)," Ex. 3.

In an order dated 3 June 1976, the Commission reaffirmed its order of 6 January 1976, making the surcharge applicable to all gas sold by NCNG to non-residential customers.

The Commission made detailed findings of fact, including the following:

"11. At the levels of supply existing up to and through the first part of January, 1976, NCNG, under Commission priorities for curtailment, curtailed, by the percentages shown in Nery's Exhibit 3, all high priority industrial and commercial customers. During that period Farmers Chemical continued to operate at 100% of its requirements. Farmers Chemical's Tunis plant requires 29,200 mcf per day to operate.

12. At the time the contract was made, NCNG made the only emergency purchase for the winter season 1975-76 to serve high priority industrial and commercial customers, and there are the customers of NCNG which benefited from the temporary emergency purchase.

*    *    *

14. The emergency purchase by NCNG from Michigan Consolidated enabled NCNG to serve not only Farmers Chemical but industrial and commercial customers in lower priorities.

15. Farmers Chemical received 100% of its natural gas requirements from NCNG for the entire 1975-76 winter season up to and including the date of this Order. No other industrial or commercial customer of NCNG received 100% until January 15, 1976, when several of them did so.

16. By telegram of December 1, 1975, NCNG notified Farmers Chemical of its intent to make an emergency pur-

---

---

chase of natural gas supply and indicated the approximate amount of the surcharge.

*      *      *

18. The emergency surcharge for all industrial and commercial customers of NCNG for this emergency purchase is approximately 18.5¢ per mcf.

19. All industrial and commercial customers of NCNG benefited from the emergency purchase by NCNG from Michigan Consolidated for the winter season 1975-76."

The Commission then stated in detail its conclusions, including the following:

"There is at issue in this proceeding and for determination by the Commission the pricing of a short-term emergency purchase by NCNG of natural gas. Farmers Chemical contends (1) that it should either be exempt from the emergency surcharge because of restorations to NCNG which occurred sometime after the contract was entered for the emergency purchase or (2) that all customers, including residential customers, should have to pay the emergency surcharge if Farmers Chemical has to pay for it.

Farmers Chemical raises certain positions taken by the Commission before the Federal Power Commission and contends that the same should be applicable in this proceeding. The efforts of the Commission before the FPC were on behalf of all natural gas users in North Carolina and especially Farmers Chemical since Farmers Chemical was forced to experience curtailment for one month in the 1974-75 winter season. The efforts of the Commission were an attempt to obtain the largest possible volumes of natural gas supplies for North Carolina users. The proceeding only involved settlement purposes, and volumes were the primary consideration. The Commission's action in this proceeding is not inconsistent with positions taken before the FPC.

The questions before the Commission in this case must turn on the decision of NCNG management at the time the contract with Michigan Consolidated was entered into sometime in late November or early December, 1975.

Faced with the most critical projected curtailment in the history of the company, we conclude that it was prudent of the management of NCNG to make the emergency purchase for the 1975-76 winter season from Michigan Consolidated. At that time Mr. Wells, Vice President of NCNG, indicated that the emergency purchase was made for NCNG's high priority industrial and commercial customers and that the time framework for this decision was 'definitely crucial.'

While we do not regard the notice by NCNG to Farmers Chemical as important to the determination of the issues of this proceeding, the Commission observes that by telegram of December 1, 1975, NCNG advised Farmers Chemical of the possibility of the emergency purchase and the approximate amount of the projected surcharge. Farmers Chemical knew at that time and certainly not later than January 8, 1976, when the first billing was received that it would be receiving volumes from the emergency purchases.

In the brief filed by counsel for Farmers Chemical, the company indicates on November 6, 1975, it 'agreed with NCNG to operate on then known volumes of curtailment until approximately January 3, 1976, and then close' the Tunis plant. Farmers Chemical continued to receive natural gas supplies throughout the entire 1975-76 winter season and should be obligated to pay for those supplies.

To allow an exemption would be unlawful under G.S. § 62-140.

We recognize that Farmers Chemical uses natural gas for feedstock purposes and cannot operate its plant at Tunis without natural gas. Farmers Chemical is the only customer of NCNG that received 100% of its plant requirement for the winter season 1975-76 to date and in particular during the periods of curtailment from October, 1975, through January 15, 1976.

Under the facts of this case, it is clear that residential customers would not have been curtailed for any period and, therefore, did not benefit directly from the emergency purchase. It is equally clear that Farmers Chemical and all other industrial and commercial customers did benefit from

the emergency purchase. Accordingly, under the facts of this case, we conclude that it is appropriate to approve the tariffs filed on January 7, 1976, as just and reasonable and to deny the petition of Farmers Chemical for reconsideration."

The Commission therefore ordered:

"1. That the Petition for Reconsideration filed by Farmers Chemical in this proceeding be, and the same hereby is, denied.

2. That the tariffs filed by NCNG on January 7, 1976, and heretofore approved by the Commission are approved under this Order and affirmed."

Farmers Chemical Association appealed.

*Sanford, Cannon, Adams & McCullough, by William H. McCullough, H. Hugh Stevens, Jr., and Charles C. Meeker, for the petitioner appellant.*

*North Carolina Utilities Commission by Commission Attorney Edward B. Hipp and Deputy Commission Attorney Maurice W. Horne, for the applicant appellee.*

*Joyner & Howison, by Henry S. Manning, Jr., for the intervenor appellee.*

MARTIN, Judge.

Farmers Chemical assigns as error the action of the Commission in finding and concluding that Farmers Chemical was served by or benefited from NCNG's purchase of emergency gas. It contends there is no competent, material and substantial evidence in view of the entire record as submitted to support such findings and conclusions.

Upon appeal, the authority of the reviewing court to reverse or modify the order of the Commission, or to remand the matter to the Commission for further proceedings, is limited to that specified in G.S. 62-94, which includes the authority to reverse or modify such order on the ground that it is unsupported by competent, material and substantial evidence or is arbitrary or capricious. When the Commission's findings are supported by competent, material and substantial evidence, they are binding upon the appellate court. *Utilities Comm. v. Telephone Co.,* 281

N.C. 318, 189 S.E. 2d 705 (1972). See *Comr. of Insurance v. Automobile Rate Office,* 30 N.C. App. 427, 227 S.E. 2d 603 (1976), *modified* and *remanded* 292 N.C. 1, 231 S.E. 2d 867 (1977).

The Commission found

" . . . NCNG made the only emergency purchase for the winter season 1975-76 to serve high priority industrial and commercial customers, and there are the customers of NCNG which benefited from the temporary emergency purchase. . . . All industrial and commercial customers of NCNG benefited from the emergency purchase by NCNG from Michigan Consolidated for the winter season 1975-76."

Among the conclusions reached by the Commission, the following appears: "It is equally clear that Farmers Chemical and all other industrial and commercial customers did benefit from the emergency purchase."

Calvin B. Wells, Vice President with NCNG, recognized the restrictive requirement of Farmers Chemical when he testified:

" . . . they cannot operate when the gas supply is significantly below their total requirement, and so we had to develop a procedure which would let them operate for a certain number of days and given·that amount of gas for the whole winter and be down for the other days and yet not let them operate so long that it would build up a deficit and become an undue risk for the other customers in case of a cutback later on by Transco and this is why we established the first date of cutoff as being January 3. . . . At the November 6 meeting, it was agreed that the first operating period for Farmers Chemical would be from November 16 to January 3, 1976. That meeting was *predicated upon then known entitlements from Transco.*"

John A. Lawrence, Vice President and General Manager of Farmers Chemical, testified:

"At the time of the November 6 meeting, NCNG's winter entitlement was 10,337,000 Mcf. This figure did not include emergency volumes. This entitlement represented NCNG's winter entitlement as per the Transco Interim Settlement Agreement.

Based upon such entitlement, NCNG said the Tunis plant for the 1975-76 winter season in 0.1 priority could be served 2,003,876 Mcf, or 45% of our requirements. On the basis of 29,200 Mcf per day, NCNG in terms of days of the 1975-76 winter period could serve FCA for 68.6 days of the 152-day winter period.

The agreement as to how the FCA plant at Tunis would run from the beginning of the winter period, November 16, 1975, was that the Tunis plant would be allowed to take an average of 29,200 Mcf per day from November 16, 1975, through January 3, 1976.

If gas consumption at the Tunis plant averaged less than 29,000 Mcf per day, the unused portion of the gas could be used to extend the operating period for up to three days or through January 6, 1976. Assuming no additions to Transco's supply and no extra additions to Transco's supply and no extra gas was available as a result of a warm winter, the Tunis plant would be shut down at the end of the first winter period, i.e., between January 3 and January 6, and would remain down for three weeks. The plant would then reopen and run until February 12 or the balance of the winter, depending upon availability of gas. It was further understood that if Transco made restorations to its gas supply prior to January 3, and NCNG had not experienced an abnormally cold winter, the first winter period would be extended depending upon NCNG's flexibility."

Thus, the evidence is abundantly clear that Farmers Chemical was operating between 16 November and 6 January on an allotment of gas by NCNG from its (NCNG) known entitlement from Transco as of 6 November. Emergency gas or increased entitlement from Transco was unnecessary to enable NCNG to supply Farmers Chemical the 2,003,876 Mcf or 45% of its winter requirement to be used between 16 November and 3 January. It is true that Farmers Chemical operated at 100% capacity during this period but it operated on its winter share of the known entitlement of NCNG as of 6 November.

The order of the Commission was content to state that Farmers Chemical operated on 100% capacity without making sufficient findings that would explain its operating procedure.

Furthermore, we do not find that during the winter season, NCNG was without sufficient flowing gas to supply Farmers Chemical with 100% service. The Commission found that:

> "Transco made restoration of flowing gas volumes to NCNG on November 13, 1975, for the 1975-76 winter period in the amount of 1,019,000 mcf. This increased somewhat NCNG's ability to serve Farmers Chemical from 45% for winter service to 65% for winter service. On December 10, 1975, Transco made another restoration to NCNG for the 1975-76 winter season of 608,000 mcf. On January 15, 1976, Transco made a further restoration to NCNG for the 1975-76 winter season of 1,494,000 mcf."

What the Commission overlooked is the fact that the allotment to Farmers of its 45% (2,003,876 mcf) share of the known entitlement of NCNG was sufficient to serve Farmers Chemical at 100% capacity until 3 or 6 January. The 13 November, 10 December, and 15 January restorations provided NCNG with sufficient flowing gas to serve Farmers Chemical its remaining requirement for the period commencing 6 January until the end of the winter season. (29,200 Mcf per day times 152 day winter season equals 4,438,400 Mcf which is 100% allotment.)

As we interpret Nery's exhibit 3, the percentages therein stated affecting Farmers Chemical relate to the percentages available for the winter season, November 16, 1975, to April 15, 1976. For instance, the 45% relates to the amount Farmers Chemical is entitled for the 152 day winter season to be used in a 68.8 day period commencing 6 November. The other percentages simply show an extension of the days allowed with the restoration and with both the restoration and the emergency gas for the period 16 November 1975 to 15 April 1976.

In its brief the Commission stated, in discussing Nery's exhibit 3, as follows:

> "This exhibit clearly demonstrates that under the supplies as they actually became available, Farmers Chemical *would have been curtailed* 45% on October 3, 1975; 65% on November 13, 1975; *greater than* 93% on December 10, 1975 and those undisputed circumstances used *hindsight. Even with restoration* of flowing gas, Farmers Chemical and other industrial customers were curtailed for those percentages. Yet the record clearly shows, and the appellant does

not dispute the fact, that Farmers Chemical continued to take 100% of its natural gas requirements throughout the winter season."

Under column October 3, 1975, of Nery's exhibit 3, appears the figure of 2,003,876 (45%). Mr. Wells, testified:

". . . they [Farmers Chemical] cannot operate when the gas supply is significantly below their total requirement, and so we had to develop a procedure which would let them operate for a certain number of days and given that amount of gas for the whole winter and be down for the other days. . . . At the November 6 meeting, it was agreed that the first operating period for Farmers Chemical would be from November 16 to January 3, 1976. That meeting was predicated *upon then known entitlements from Transco* . . . that used up most of the 69 days supply that Farmers Chemical had coming based on that supply and short period of time, based on that supply on January 24th and then run for a few days and shut down for the rest of the winter."

Thus, the 2,003,876 or 45% entitlement of Farmers Chemical was the winter allotment as of October 3, 1975, and by agreement on 6 November was to be used between 16 November and 3 January, shut down for three weeks and resume for a few days and then shut down for the winter.

We understand the amounts and percentages reflected in Nery's exhibit 3 under the columns November 13, 1975, December 10, 1975, and January 15, 1976, were not curtailments but merely showed the amounts of increase of entitlement to Farmers Chemical by restoration of flowing gas and emergency gas and the percentages of entitlement as of those dates for the entire winter season. They project the percentages of availability as of those dates for use during the entire winter season.

Mr. Wells further stated: "There were restorations by Transco on November 13 and December 10. *It is correct* that that would have extended the operating period." Thus, neither restoration of flowing gas nor emergency gas was necessary for Farmers Chemical between 16 November and 3 January. The restorations of flowing gas simply extended the operating period of Farmers Chemical from 3 January to the end of the

winter season and was sufficient without the emergency gas for the needs of Farmers Chemical.

We are unable to agree with the statement of the Commission in its brief that:

> "If the emergency purchase had been excluded it is obvious that the curtailment for Farmers Chemical and other industrial customers would have been substantially deeper at December 10, 1975."

Whatever effect this had on "other industrial customers" is not before us. However, we repeat, as of December 10, 1975, Farmers Chemical was operating on its winter entitlement as of 6 November agreement and was not dependent at that time upon either restoration of flowing gas or emergency gas. It was simply using 100% of its 45% winter allotment.

The fact that Farmers Chemical was operating on an entitlement which would enable them to operate at 100% capacity for 68.8 days by agreement with NCNG is further demonstrated by a telegram sent to Farmers by Arthur P. Gnam, Jr., Vice President Operations of NCNG dated 1 December. In the telegram Farmers Chemical was notified that by reason of the purchase of emergency gas the new entitlement of the Tunis plant "is 3,676,173 mcf or 124 days service at 29,200 mcf per day. . . ."

The record reveals that Farmers Chemical never agreed to purchase emergency gas and were willing to shut down when its 45% allotment was exhausted. Had it not been for the restoration of the flowing gas they would have had to shut down or purchase emergency gas. It was the good fortune of Farmers Chemical that restoration of flowing gas came in time to enable them to continue operations after 3 January. It must have been apparent to the Commission that there was no competent evidence that Farmers Chemical used emergency gas but they say that Farmers Chemical benefited from its purchase. The Commission failed to find facts that support such conclusion. However, the Commission makes the novel assertion that:

> "The questions before the Commission in this case must turn on the decision of NCNG management at the time the contract with Michigan Consolidated was entered into sometime in late November or early December, 1975."

The Commission found that:

> "[A]t the time Mr. Wells, Vice President, of NCNG, indicated that the emergency purchase was made for NCNG's high priority industrial and commercial customers and that the time framework for this decision was 'definitely crucial.'"

The action of Mr. Wells was a business venture that did not obligate an unwilling customer to use the gas. Farmers Chemical's unwillingness to purchase the emergency gas was made clear prior to its purchase by NCNG.

While we recognize the obligation of a utility adequately to serve its customers, we are not aware of a requirement that obligates the action taken by NCNG. The Commission correctly found as a fact that "NCNG has a legal obligation to serve all of its customers under the priorities approved by the Commission and under available supplies from Transco." Of course, NCNG holds a certificate to serve subject area and along with that obligation comes the necessity to purchase a sufficient supply of gas to serve them. NCNG's legal obligation must be a function of availabilities and priorities. Farmers Chemical was under a long term contract with NCNG for service. It was entitled to its share of flowing gas according to its priority. It asked for nothing more. Emergency gas should not have been purchased for Farmers Chemical against its consent. Especially is this so when Farmers Chemical is bearing part of the cost of supplying gas to lower priority customers and is helping to subsidize the increased cost to residential customers. The Commission has failed to find facts that demonstrate a benefit to Farmers Chemical.

In our discussion of the evidence we have not undertaken to say what weight the Commission should give to the testimony of the various witnesses. We have referred to evidence that, if believed by the Commission, would support essential findings that were not made. The credibility of the evidence and the weight to be given it was for the determination of the Commission. *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681 (1974); *Utilities Comm. v. Power Co.*, 285 N.C. 398, 206 S.E. 2d 283 (1974).

In addition to those already discussed, the Commission made no findings and conclusions on the following important issues in the case:

1. Whether on November 6, 1975 Farmers Chemical and NCNG agreed that appellant would accept its fifty-five percent (55%) winter curtailment by operating at full capacity until January 3, 1976, and then closing down completely for various periods thereafter;

2. Whether the three Transco restorations permitted Farmers Chemical to operate at one hundred percent (100%) capacity throughout the 1975-76 winter without resorting to the use of any emergency gas;

3. Whether Transco Interim Settlement established prices for emergency gas volumes incrementally and treated such gas as being injected last into the pipeline system for the period covered by such settlement;

4. Whether Farmers Chemical put NCNG on notice in November and December, 1975 that it did not want any emergency gas; and

5. Whether residential customers should be excluded from paying their share of the emergency surcharge.

"A failure to find facts essential to a determination of the rights of the parties necessitates a remand to the . . . agency charged with that responsibility." *Utilities Commission v. Membership Corporation*, 260 N.C. 59, 69, 131 S.E. 2d 865, 871 (1963).

Such findings and conclusions are necessary to enable this Court to determine whether the Commission had performed the duty imposed by statute. The matter is remanded to the Commission to make necessary findings and conclusions on which it may base its order.

Reversed and remanded.

Judges Morris and Vaughn concur.