STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION AND DUKE POWER COMPANY (APPLICANT) v. WELLS EDDLEMAN (APPELLANT) AND PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION; LACY H. THORNBURG, ATTORNEY GENERAL; CITY OF DURHAM; AND CONSERVATION COUNCIL OF NORTH CAROLINA (CROSS-APPELLANTS)

No. 39A86

(Filed 28 July 1987)

1. **Utilities Commission § 55— findings mislabeled — sufficient**

Findings by the Utilities Commission satisfied the requirements of N.C.G.S. § 62-79, even though the findings and conclusions were mislabeled, where the Supreme Court was able to separate facts from conclusions.

2. **Utilities Commission § 57— conclusion that decision to build and complete Catawba Unit 1 reasonable — supported by testimony of Duke's chairman**

The Utilities Commission finding that Duke Power Company's decision to construct and complete Catawba Unit 1 was reasonable, prudent and made in good faith was supported by the testimony of Duke's chairman, even though that testimony was contradicted by other witnesses and even though the Commission did not indicate the weight given to the conflicting testimony. The Utilities Commission may agree with a single witness, no matter how many opposing witnesses come forward, if the evidence supports that witness's position; moreover, the Commission clearly stated why it found the opposing testimony less persuasive than the chairman's testimony. N.C.G.S. § 62-94 (b)(5).

3. **Utilities Commission § 55— review of Utilities Commission order—function of Supreme Court**

The statutory function of the Supreme Court is not to determine whether there was evidence to support a position the Commission did not adopt, but whether there was substantial evidence in view of the entire record to support the position the Commission did adopt. N.C.G.S. § 62-94(b) (1982).

4. **Utilities Commission § 35— Catawba Unit 1—not excess generating capacity**

The evidence in a general rate case supported the Utilities Commission's explicit rejection of appellants' arguments concerning calculation of Duke Power Company's reserve margin and the use of the Belews Creek Unit 1 as a cycling plant; moreover, the evidence as a whole supported the conclusion that Catawba Unit 1 did not represent excess generating capacity.

5. **Utilities Commission § 15; Electricity § 2.5— nuclear plant built in South Carolina by Duke Power Company—no North Carolina certificate of convenience and necessity required**

Duke Power Company was not required to obtain a North Carolina certificate of convenience and necessity prior to beginning construction of the Catawba Nuclear Station, which was built in South Carolina and which partially served North Carolina customers, because N.C.G.S. § 62-110.1 did not contemplate advance certification by the North Carolina Utilities Commission of

facilities built in other states. Facilities must still be "used and useful" in providing service to North Carolina customers before they can be included in a public utility's rate base, and the Utilities Commission is directed by N.C.G.S. § 62-110.1(c) to confer with officials from other states and the federal government for the purpose of assessing the need for future generating facilities.

6. **Utilities Commission § 32— Catawba Nuclear Station—common plant included in rate base—only one unit in operation**

   The Utilities Commission acted within its authority when it included in Duke Power Company's rate base the company's ownership interest in all of the Catawba Nuclear Station's common plant, including such things as switching stations, waste treatment facilities, shops, laboratories, roads and parking lots, even though Catawba Unit 2 is still under construction. There was sufficient evidence that all of the costs for common plant were necessary for the safe and reliable operation of Catawba Unit 1 and were indivisible. N.C.G.S. § 62-133(b)(1).

7. **Utilities Commission § 57— Catawba Nuclear Station—buyback agreement with municipal power agencies—agreement reasonably entered into**

   The Utilities Commission properly found that Duke Power Company's buyback agreements with municipal power agencies and cooperatives were reasonably entered into as a means of financing completion of the Catawba Nuclear Station where the evidence supported the Commission's finding that financing charges had been minimized as a result of the Catawba sales and that those savings will benefit retail rate payers.

8. **Utilities Commission § 32— Duke Power Company—general rate hearing—inclusion of McGuire Nuclear Station in rate base**

   There was competent, material and substantial evidence in a general rate case to support the Utilities Commission's inclusion of the entire McGuire Nuclear Station in Duke Power Company's rate base, despite reliability exchange provisions with municipal power agencies and cooperatives which gave them the right to receive power from the McGuire station at very low rates prior to the completion of the Catawba Unit 2.

9. **Utilities Commission § 57— Catawba Nuclear Station—amendment to buyback contract with local power agency—no error**

   In a general rate case involving Duke Power Company's Catawba Nuclear Station, the Utilities Commission acted within the scope of its authority when it permitted Duke Power to recover costs associated with amendments to its contract with the North Carolina Municipal Power Agency for the sale and buyback of a portion of the capacity of Catawba Unit 2.

10. **Utilities Commission § 38— operating and maintenance costs—not levelized—no error**

    In a general rate case involving Duke Power Company's sale of some of the capacity of its Catawba Nuclear Station to municipal power agencies and cooperatives and a plan for Duke Power to buy back some of that capacity, the Commission did not err by refusing to levelize the operating and maintenance component of the buyback costs, even though there was little if anything in

State ex rel. Utilities Comm. v. Eddleman

the record to support the Commission's conclusion that operation and maintenance costs were more variable than capital costs, which were levelized. There was nothing to suggest that the Commission's conclusion was wrong and common sense indicates that it was reasonable. The use of AFUDC rates to compute carrying costs from the levelization plan was not erroneous, even though Catawba Unit 1 is now in commercial operation and is not under construction, because Duke Power was not granted an AFUDC as such.

**11. Appeal and Error § 46— evenly divided Supreme Court—Utilities Commission affirmed on that issue without precedential value**

In a general rate case in which Justice Meyer did not participate and the Supreme Court was evenly divided on the issue of whether the Utilities Commission properly allowed Duke Power to recover costs associated with its abandoned Perkins and Cherokee Nuclear Stations, the decision of the Utilities Commission was affirmed without precedential value.

**12. Electricity § 2.5; Utilities Commission § 41— Duke Power—general rate case —rate of return**

The Utilities Commission properly exercised its discretion in a general rate case by setting a rate of return within the range of those recommended by witnesses for Duke Power and for the public staff, and did not err by finding that Duke Power's capital rate structure included a common equity component of 45.52 percent. N.C.G.S. § 62-133(c).

**13. Electricity § 3.1— rate differential—method for narrowing**

The public staff did not meet its burden of showing that the Utilities Commission erred in its rationale for adopting Duke Power's proposed method of narrowing the disparity between the rates of return for the residential customer class and the general and industrial class.

**14. Utilities Commission § 39— Duke Power Company—general rate case—interest synchronization**

The Utilities Commission acted within its discretion and in conformance with applicable judicial precedent when it decided not to put Duke Power Company's receipt of a tax credit at risk by adopting the Attorney General's proposal for interest synchronization. At the time the order in the case was issued, the IRS rulemaking permitting interest synchronization was merely a proposed rulemaking which might never have become final.

**15. Utilities Commission § 39— Duke Power not required to seek private letter rulings from IRS—no error**

The Utilities Commission did not abuse its discretion by refusing to order Duke Power Company to seek private letter rulings from the IRS on accumulated deferred taxes and investment tax credits.

Justice MEYER took no part in the consideration or decision of this case.

APPEAL by intervenors pursuant to N.C.G.S. § 7A-29(b) from the final order of the North Carolina Utilities Commission entered

17 September 1985 in Docket No. E-7, Sub 391. Heard in the Supreme Court 11 June 1986 and 9 February 1987.

*Steve C. Griffith, Jr., George W. Ferguson, Jr., Ronald L. Gibson, and Kennedy Covington Lobdell & Hickman, by Clarence W. Walker and Myles E. Standish, for applicant-appellee Duke Power Company.*

*Wells Eddleman, intervenor-appellant pro se.*

*Robert Gruber, Executive Director, by James D. Little, Staff Attorney, and Michael L. Ball, Staff Attorney, Public Staff— North Carolina Utilities Commission, for the Using and Consuming Public.*

*Lacy H. Thornburg, Attorney General, by Jo Anne Sanford, Special Deputy Attorney General, Karen E. Long, Assistant Attorney General, and Angeline M. Maletto, Assistant Attorney General, for the Using and Consuming Public.*

*W. I. Thornton, Jr., City Attorney, for the City of Durham.*

*Edelstein and Payne, by M. Travis Payne, for the Conservation Council of North Carolina.*

EXUM, Chief Justice.

This is an appeal from an order of the North Carolina Utilities Commission in a general rate case. Numerous questions concerning the legality of the order have been raised by appellant intervenors and will be treated seriatim.

Procedurally, the case comes to this Court as follows:

On 15 February 1985, Duke Power Company filed an application with the North Carolina Utilities Commission seeking to increase electric utility rates for North Carolina retail customers effective 17 March 1985. The rates sought would have produced approximately $339,980,000 in additional revenues for Duke Power, and would have increased the company's North Carolina retail charges by approximately 19.7 percent. Among the reasons given by Duke for the requested increase were: (1) the need to recover expenses associated with Duke's contractual obligation to purchase power from the joint owners of Catawba Nuclear Station; (2) the need to include in Duke's ratebase the company's 12.5

percent ownership in Catawba Unit 1; (3) the need for an increase in Duke's return on common equity; and (4) the need to recover increased operating expenses, including those associated with Duke's cancellation of its Perkins and Cherokee nuclear stations.

Various parties, including appellant and cross-appellants, were permitted to intervene in the proceedings. On 12 March 1985 the Commission entered an order suspending the proposed rate increase for a period of up to 270 days. The Commission then declared Duke's application to be a general rate case. Public hearings were held in five cities, and the Commission began hearing the case in chief on 9 July 1985. Duke Power subsequently reduced its requested increase to $292,763,000, primarily because of a decrease in the cost of capital and a two-month delay in commercial operation of Catawba Unit 1.

On 17 September 1985, the Utilities Commission entered an order granting Duke an overall revenue increase of 9.52 percent, or approximately $165,000,000. Intervenors Wells Eddleman, the Public Staff, the Attorney General, the City of Durham, and the Conservation Council of North Carolina appealed to this Court.

I.

Duke Power Company began construction of its Catawba Nuclear Station in 1973, at a time when Duke's forecasts indicated that additional generating capacity was needed if the company was to meet future demand for electricity. A year later, Duke suffered a financial crisis that made it impossible for the company to go forward with its expansion program. Construction of Catawba was suspended and Duke offered some of its assets for sale.

Duke then decided to finance further construction of Catawba by selling portions of the station to various municipal power agencies and cooperatives, each of which had access to capital not available to Duke. Before these sales could be made, however, certain statutory and constitutional changes had to take place in North Carolina. The legislature responded to this need in 1975 by enacting the Joint Municipal Electric Power and Energy Act, 1975 N.C. Sess. Laws ch. 186, § 1, which authorized joint ownership by municipalities of electrical generating facilities. N.C.G.S. § 159B-11(10) (Cum. Supp. 1985). Two years later the North Carolina Constitution was amended to allow the state's newly created

joint municipal power agencies to own property jointly with other public and private entities, including public utilities. N.C. Const. art. V, § 10. The General Assembly shortly thereafter enacted N.C.G.S. § 159B-5.1, which authorizes municipal power agencies to enter into agreements such as the one Duke Power was proposing with respect to Catawba.

In 1978, Duke sold a 75 percent interest in Catawba Unit 2 to the North Carolina Municipal Power Agency #1 (NCMPA), which serves some twenty cities in this state. The next year Duke sold the remaining 25 percent of Unit 2 to the Piedmont Municipal Power Agency (PMPA) in South Carolina. In 1981, Duke sold 75 percent of Catawba Unit 1 to its North Carolina and South Carolina cooperative customers. Duke retains a 25 percent interest in Unit 1. For purposes of this rate case, however, Duke is treated as if it has a 12.5 percent interest in Unit 1.[1]

---

1. The Utilities Commission, in its Evidence and Conclusions for Finding of Fact No. 10, stated:

> [Duke chairman] Lee testified that Duke had sold 100% of Catawba Unit 2 to NCMPA and PMPA and 75% of Catawba Unit 1 to [the cooperatives], leaving the Company with 25% of Catawba Unit 1. He stated, however, that Duke's true economic interest in Catawba Unit 1 was only 12.5% because of the exchange entitlements between the owners of Catawba Unit 1 and Catawba Unit 2. [See Part IV. of this opinion.] As a result of these exchanges, Duke is entitled to 12.5% of the output of Catawba Unit 1 and 12.5% of the output of Catawba Unit 2. Witness Lee explained that the reason Duke had title to 25% of Unit 1 rather than 12.5% of each unit was because of a legal problem that the South Carolina municipalities [PMPA] had in owning a unit jointly with an investor owned utility such as Duke. Therefore, these sales were structured so that the South Carolina municipalities would not have title to any property which was jointly owned by Duke but the economic substance of the transaction would be such that Duke and each of the Catawba Purchasers would own an equal interest in each unit. Witness Stimart testified that the payments made by the Catawba Purchasers and by Duke for the construction of the Catawba Station were made upon the basis of a percentage of the cost of the station rather than a percentage of the cost of the individual units each entity owned. . . .

> [T]he Commission concludes that it would be inappropriate to ignore the economic substance of the transaction and to rely merely upon which party has title in determining the amount properly includable in Duke's rate base. Thus, for purposes of this case, Duke is entitled to collect rates based upon 12.5% of the cost of Catawba Unit 1 in its cost of service.

None of the parties to this appeal has challenged the Commission's decision with respect to this matter.

The various Catawba sales agreements are lengthy and complex documents, but each contains several similar provisions. First, Duke is to operate Catawba just as it would any of its own plants; all power generated by the station flows into Duke's system. Second, the agreements establish how power received from Duke by the Catawba purchasers will be priced. Third, Duke is required to "buy back" a portion of the Catawba capacity owned by the municipal power agencies and cooperatives. Finally, the agreements provide for certain reliability exchanges between the two Catawba units and between Catawba and Duke's McGuire Nuclear Station.

The rate increase at issue in this case was requested by Duke shortly before Catawba Unit 1 was declared commercially operational on 29 June 1985. Approximately 80 percent of the $340 million increase sought by Duke was attributable to Unit 1, and included both the cost of Duke's ownership interest in that unit and the cost of buybacks mandated by the Catawba sales agreements. The Utilities Commission held several weeks of hearings and found, among other things: (1) that Duke's decisions to construct and complete Catawba Unit 1 were reasonable and prudent; (2) that Duke's ownership interest in Unit 1 is used and useful in providing electric utility service to Duke's North Carolina retail ratepayers; (3) that Unit 1 does not represent excess generating capacity; (4) that each of the Catawba sales agreements entered into by Duke was reasonable and prudent; and (5) that these agreements collectively resulted in lower rates for Duke's North Carolina retail customers than would have prevailed had Duke financed Catawba itself. The $165 million rate increase unanimously approved by the Commission was approximately 48.5 percent of the amount originally requested by Duke, and approximately 56.3 percent of the company's revised request.

## II.

[1] The Attorney General and City of Durham contend that the findings of fact included by the Utilities Commission in its rate-making order fail to satisfy the requirements of N.C.G.S. § 62-79. This statute states, in pertinent part, that:

(a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine

the controverted questions presented in the proceedings and shall include:

(1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record . . . .

N.C.G.S. § 62-79(a) requires the Commission "to find all facts essential to a determination of the question at issue." *State ex rel. Utilities Comm. v. Haywood Electric Membership Corp.*, 260 N.C. 59, 64, 131 S.E. 2d 865, 868 (1963) (decided under predecessor statute N.C.G.S. § 62-26.3). The Commission, however, is not required to comment on "every single fact or item of evidence presented by the parties." *State ex rel. Utilities Comm. v. Nantahala Power & Light Co.*, 313 N.C. 614, 745, 332 S.E. 2d 397, 474 (1985), *rev'd on other grounds*, --- U.S. ---, 90 L.Ed. 2d 943 (1986).

The purpose of the findings required by G.S. § 62-79(a) is to provide the reviewing court with sufficient information to allow it to determine the controverted questions presented in the proceedings. . . . The Commission's summary of the appellant's argument and its rejection of the same is sufficient to enable the reviewing court to ascertain the controverted questions presented in the proceeding. That is all that G.S. § 62-79 requires.

*State ex rel. Utilities Comm. v. Conservation Council of North Carolina*, 312 N.C. 59, 62, 320 S.E. 2d 679, 682 (1984).

The Attorney General and City of Durham contend that twenty-three of the Commission's thirty-one findings of fact actually are "mere conclusions." For example, Finding of Fact No. 6, which appellants seem to find particularly objectionable, states that "[t]he decisions made by Duke Power Company to construct and complete Catawba Unit 1 were reasonable, prudent, and made in good faith."

Appellants are correct in asserting that this statement is a conclusion of law rather than a finding of fact. Findings of fact are statements of what happened in space and time. These facts, when considered together, provide the basis for concluding, as the Commission did here, whether an action or decision was reasonable or prudent.

The Commission's mislabeling of its findings and conclusions will not, however, be fatal to its order if certain procedural requirements are met. The judgments and orders of courts and administrative bodies must reflect a basic understanding of how the decision-making process is supposed to work. "Evidence must support findings; findings must support conclusions; conclusions must support the judgment. Each step of the progression must be taken . . . in logical sequence; each link in the chain of reasoning must appear in the order itself." *Coble v. Coble*, 300 N.C. 708, 714, 268 S.E. 2d 185, 190 (1980). As long as "each link in the chain of reasoning" appears in the Commission's order, mislabeling is merely an inconvenience to the courts.

In this case, the Commission's summary of evidence, findings of fact and conclusions of law are mixed together in portions of the record denominated "Findings of Fact" and "Evidence and Conclusions for Findings of Fact." Proper labeling might have made this Court's task a little easier, but we nonetheless have been able to separate facts from conclusions in examining appellants' various assignments of error. Thus, the mislabeling of certain portions of the record does not require us to overturn the Commission's order.

[2] Appellants further contend that (1) the only evidentiary support for Finding of Fact No. 6 came from Duke's chairman, William S. Lee, whose testimony was contradicted by other witnesses; and (2) the Commission's order fails to indicate what weight, if any, it gave to the conflicting testimony.

First, we note that the Commission may agree with a single witness — if the evidence supports his position — no matter how many opposing witnesses might come forward. This Court is then required to determine whether the Commission's decision is supported by "competent, material and substantial evidence in view of the entire record as submitted." N.C.G.S. § 62-94(b)(5) (1982).

Second, the Commission, in its recitation of "Evidence and Conclusions for Finding of Fact No. 6," summarized the testimony of three witnesses opposed to Duke's application for a rate increase. In each instance the Commission clearly stated why it found this evidence less persuasive than the evidence supporting Duke's position. For example, witness Randall J. Falkenberg, testifying on behalf of the Carolina Industrial Group for Fair

Utility Rates, criticized Duke for not adopting until 1981 certain forecasting techniques that other utilities had been using for some time. This criticism implied that Duke's decision to construct and complete Catawba Unit 1 stemmed, at least in part, from overestimates of the company's future electrical load that could have been avoided if the new forecasting techniques had been employed. The Commission, in rejecting Falkenberg's critique, noted that Duke's load forecasts during the middle and late 1970s were consistently *below* the load forecasts of other utilities. Moreover, there was no evidence that Duke's decisions with respect to Catawba would have been any different if the company had used the forecasting techniques advocated by Falkenberg.

We do not deem it necessary to address each of the remaining twenty-two "findings of fact" that appellants find objectionable. The vast majority of these are simply listed by number in the Attorney General's brief. We have studied the briefs and the record, and we are persuaded that the Commission's summary of evidence, findings of fact, and conclusions of law satisfy the limited purpose of N.C.G.S. § 62-79(a).

## III.

The $165 million rate increase granted to Duke by the Commission's order of 17 September 1985 was based in part on inclusion of Catawba Unit 1 in the company's ratebase. Catawba Unit 1 was declared commercial on 29 June 1985. The Attorney General, the City of Durham, and Wells Eddleman argue that inclusion of Catawba Unit 1 in Duke's ratebase was error.

North Carolina's statutory formula for public utility ratemaking is found in N.C.G.S. § 62-133. This statute requires the Commission to determine the utility's ratebase (RB), its reasonable operating expenses (OE), and a fair rate of return on the company's capital investment (RR). These three components are then combined according to a formula that can be expressed as follows:

$$(RB \times RR) + OE = \text{REVENUE REQUIREMENTS}$$

The ratebase component of this formula is determined by calculating

the reasonable original cost of the public utility's property used and useful, or to be used and useful within a reasonable

time after the test period, in providing the service rendered to the public within the State, less that portion of the cost which has been consumed by previous use recovered by depreciation expense plus the reasonable original cost of investment in plant under construction (construction work in progress).

N.C.G.S. § 62-133(b)(1) (Cum. Supp. 1985).

In this case the Commission determined that Duke's 12.5 percent interest in Catawba Unit 1 was "used and useful in providing electric utility service to Duke's North Carolina retail ratepayers . . . within a reasonable time after the end of the test period and prior to the time the hearings in this proceeding were closed." The Commission therefore found that Duke is entitled to collect rates based on the inclusion of 12.5 percent of Catawba Unit 1 in the company's ratebase.

Appellants contend that Catawba Unit 1 represents excess generating capacity within the Duke system and therefore cannot be "used and useful" in providing electricity to North Carolina retail ratepayers. *Cf. State ex rel. Utilities Comm. v. General Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972). In addition, appellants argue that Duke's failure to acquire a North Carolina certificate of convenience and necessity for the Catawba Nuclear Station precludes inclusion of any portion of Catawba in the company's ratebase.

[3] "The question of whether specific property is presently 'used and useful' in rendering service is one of fact to be determined by the Commission upon competent and substantial evidence." *Id.* at 354, 189 S.E. 2d at 728. This Court may not set aside the Commission's determination merely because we might have drawn different conclusions from the evidence. *Id.*

The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

N.C.G.S. § 62-94(b) (1982). This Court's statutory function is not to determine whether there is evidence to support a position the Commission did not adopt. We ask, instead, whether there is substantial evidence, in view of the entire record, to support the position the Commission *did* adopt.

With these principles in mind, we will consider each of appellants' specific complaints in turn.

### A.

[4] The Utilities Commission, after hearing evidence from numerous interested parties, determined that Catawba Unit 1 "is needed to enable Duke to meet the load on its system, and does not represent excess generating capacity." The Attorney General and City of Durham contend that the Commission made two separate errors in reaching this conclusion.

### 1.

First, appellants claim that the Commission erroneously calculated Duke's capacity reserve margin. "Capacity reserve" is the amount of installed generating capacity in a system above the amount required to meet peak system load. The Commission generally considers a reserve margin of approximately 20 percent to be reasonable. A public utility's reserve margin is calculated by subtracting the system's estimated peak load from its installed generating capacity at a given point in time. The remainder is expressed as a percentage of the utility's total installed capacity. Thus, if a system is capable of producing 100 megawatts (MW) on July 1st, and the peak load as of that date is 90 MW, the system's reserve margin is 10 percent. Of course, any error in the figures representing either installed capacity or peak load will result in an incorrectly calculated reserve margin.

Appellants contend that the calculations relied upon by the Commission were affected by both types of error. Specifically, appellants complain that: (1) the figure representing installed generating capacity did not include 997 MW that could be produced by several coal-fired units; and (2) the figure representing peak system load was artificially inflated by Duke.

William S. Lee, Duke's chairman of the board, testified that Catawba Unit 1 gives the company a reserve margin of 22.9 percent, based on a forecasted 1985 summer peak load of 12,150 MW. Without Unit 1, the margin would be only 13.4 percent. Lee acknowledged that the reserve margin calculated by Duke did not include 997 MW of capacity that had been placed in extended cold shutdown (ECS). This capacity consists of twelve small coal-fired units between twenty-seven and forty-three years old placed in ECS because they no longer can provide reliable service. Lee stated that Duke would, over a three-year period, examine these units to determine whether and at what cost they could be rehabilitated. Even if rehabilitation is feasible, none of the units placed in ECS can be brought back into service until the late 1980s or early 1990s, if at all.

Appellants contend that the twelve coal-fired units in question were placed in ECS to avoid the problem of excess capacity created when Catawba Unit 1 was brought into service. The Attorney General, in his brief, argues that

> [e]vidence was adduced which tended to show that the 12 ECS units could have been available for service, given different management objectives. The evidence suggested that, in fairness to the ratepayer, a proper measure of the company's capacity reserves should have assumed operational ability on the part of those units, because the company could have kept them available for service had its management goals been other than to make way for Catawba's capacity.

In support of this contention, the Attorney General cites evidence indicating that six of the twelve ECS units had availability ratings of 100 percent in June 1983, and three others were available more than 90 percent of the time.[2]

---

2. Duke chairman Lee testified that these figures were misleading because the units in question had been called on infrequently. If the demand on the units had been higher, their reliability might have been lower.

Appellants also point out that Duke's estimate of its 1985 summer peak load (12,150 MW) was 10 percent higher than its actual 1984 summer peak (11,043 MW), despite evidence that the rate of growth in summer peak loads is declining rapidly. Moreover, the 1985 summer peak estimate adopted by Duke for purposes of this case was higher than at least one of the company's earlier estimates. According to the Attorney General, "[t]his inflated projection of a drastic annual increase in summer peak . . . make[s] the company's reserve margin appear smaller than it would using a more accurate projection of summer peak."

The Commission, in finding that Catawba Unit 1 does not represent excess capacity, specifically rejected both of the arguments made by appellants with respect to calculation of Duke's reserve margin. In its "Evidence and Conclusions for Finding of Fact No. 9," the Commission stated that

it is inappropriate to include the extended cold shutdown units in the calculation of Duke's current reserve margin. First, witness Lee's testimony concerning the condition of these units is uncontradicted. It is clear to the Commission that these units cannot provide reliable service until major repairs can be performed which will take a number of years. Second, the Commission concludes that the only way that these units can be rehabilitated so as to extend their lives for a number of years is through a comprehensive program such as the extended cold shutdown program. Ordinarily, plants of this age and condition are retired and replaced by new capacity. If this program can successfully rehabilitate these units, the units will be able to replace expensive new capacity which otherwise would have to be built. Therefore the Commission finds that the extended cold shutdown program is prudent and designed to minimize costs to the Company's North Carolina retail ratepayers. The Commission further concludes that to discourage such a program would not be in the best interests of Duke's retail ratepayers because over the long term it would increase costs by forcing the Company to run older units until they cannot be rehabilitated and thus force Duke to build new capacity rather than rehabilitating older, lower cost capacity.

The Commission also concludes that Duke's September 1984 forecast of its summer 1985 peak of 12,150 MW is the appropriate forecast to use in determining Duke's reserve margin for the summer of 1985. That forecast was based upon the most recent information available to Duke at the time at which it was made and was based on the economic conditions thought likely to prevail during the period of time it covers. No party has shown any invalid or improbable assumptions which were included in the September 1984 forecast.

We hold that the Commission's findings and conclusions with respect to Duke's reserve margin meet the requirements implicit in N.C.G.S. § 62-94. Substantial evidence in support of the Commission's decision not to include the twelve ECS units in its calculation of Duke's reserve margin is found in the testimony of Duke chairman Lee, who indicated that rehabilitation of these units would require repair or replacement of turbine rotors, precipitators and feed water heaters, reinsulation of generator rotors, rewinding of generator stators and retubing of condensers, among other things. The Attorney General acknowledges in his brief that the ECS units were "mainly not in running order" at the time of the hearing in this case.[3] Finally, a report prepared by a consultant hired by one of the Attorney General's own witnesses concluded that Duke's extended cold shutdown program "is a prudent action that is carefully designed to reduce operating costs while retaining operating flexibility."

Evidence supporting Duke's 12,150 MW summer 1985 peak load estimate again came from witness Lee. He stated that this forecast had been made in September 1984 for budgetary purposes, and that it was higher than a forecast made in 1983 because the earlier projection had been made shortly after the bottom of a recession. The September 1984 estimate was based on the improved economic conditions then prevailing, and therefore was a more reliable forecast of what would happen in 1985. The

---

3. The Attorney General implies that Duke deliberately allowed these units to deteriorate so that Catawba, when it came on line, would not constitute excess capacity. The intervenors, however, produced little — if any — evidence to support this contention. Given the advanced age of the ECS units, the Commission cannot be faulted for rejecting a claim of this sort without substantial proof of calculated mismanagement.

Commission's findings and conclusions with respect to this point also are supported by the testimony of Thomas S. Lam, an engineer appearing on behalf of the Public Staff. Lam testified that Duke's *actual* peak load in January 1985 had been 12,687 MW, and that use of this exceptionally high figure would be appropriate because a utility must meet the highest peak load on its system, whenever that occurs.[4]

2.

The Attorney General and City of Durham claim that Duke's excess generating capacity is further demonstrated by the company's plans to convert its ten-year-old, coal-fired Belews Creek Unit 1 to service as a cycling plant. Cycling plants, as the name implies, cycle on and off as system load dictates. Baseload units, by way of contrast, operate continuously to meet the utility's basic generating requirements. Appellants point out that Belews Creek Unit 1 is a highly efficient plant, ranked seventh in the nation as recently as August 1984. Conversion of such a plant to cycling duty, they argue, "is *strongly* suggestive of a surfeit of baseload capacity from other units."

This argument misses the point. As we stated earlier, this Court's duty is not to determine whether there is any evidence to support a position the Commission did not adopt; rather, we examine whether the evidence, in view of the entire record, supports the position it *did* adopt. The Commission concluded that Duke's treatment of Belews Creek Unit 1 does not indicate that the company has excess generating capacity. Evidence supporting this conclusion is found in the testimony of Duke chairman Lee, who stated that conversion of coal-fired units from baseload to cycling duty is an inevitable result of the aging process; every coal-fired unit ever built by Duke has been treated in this fashion. Nuclear plants, on the other hand, generally serve as baseload units because their running costs are lower. Lee also stated that Belews Unit 1 will not be operated exclusively as a cycling plant, but will be used as a baseload unit at various times during the year.

4. Peak loads naturally go hand-in-hand with extreme weather conditions. Duke's peak loads normally occur in the summer.

The Attorney General's own witness, Dr. John W. Wilson, testified that Catawba Unit 1 could run with a capacity factor of almost 50 percent without displacing generation from either Belews Creek or Duke's older Marshall units. The Commission, in response to this testimony, noted that the average capacity factor for units comparable to Catawba is only 57 percent, and therefore the amount of generation displaced from Marshall and Belews Creek, if any, is likely to be minimal.

In sum, we find that there is substantial evidence supporting the Commission's explicit rejection of appellants' arguments concerning (1) calculation of Duke's reserve margin, and (2) use of Belews Creek Unit 1 as a cycling plant. Moreover, the evidence taken as a whole supports the Commission's conclusion that Catawba Unit 1 does not represent excess generating capacity. We therefore affirm the Commission's decision with respect to this matter.

B.

[5]   The Catawba Nuclear Station is located in South Carolina. Before beginning construction, Duke obtained a certificate of convenience and necessity from the South Carolina Public Service Commission, as required by the law of that state. No such certificate was obtained from the North Carolina Utilities Commission. The Attorney General, the City of Durham, and Wells Eddleman contend that N.C.G.S. § 62-110.1 requires Duke to get a North Carolina certificate of convenience and necessity prior to beginning construction of any facility that will provide service to customers in this state. Appellants argue that the Commission has no authority to waive Duke's failure to comply with this statute, and therefore no authority to permit inclusion of Catawba Unit 1 in Duke's ratebase.

N.C.G.S. § 62-110.1 states, in pertinent part, that

no public utility or other person shall begin the construction of any steam, water, or other facility for the generation of electricity to be directly or indirectly used for the furnishing of public utility service . . . without first obtaining from the Commission a certificate that public convenience and necessity requires, or will require, such construction.

The Commission concluded that it was not necessary to determine whether this statute required Duke to obtain a North Carolina certificate for Catawba because "(1) if a certificate had been sought, it is clear from the evidence in this record that the certificate would have been granted for Catawba Unit 1 and (2) the Commission has been aware of the construction of Catawba Unit 1 from the time construction began."

We hold that Duke was not required to obtain a North Carolina certificate of convenience and necessity prior to beginning construction of the Catawba Nuclear Station. We therefore find it unnecessary to determine whether the Commission may waive the requirements of N.C.G.S. § 62-110.1, and equally unnecessary to determine the remedy for a violation of that statute.

The statute, while not a model of clarity on this point, does not appear to contemplate advance certification by the North Carolina Utilities Commission of facilities built in other states. For example, the statute directs the Commission to develop and maintain "an analysis of the long-range needs for expansion of facilities for the *generation of electricity in North Carolina.*" N.C.G.S. § 62-110.1(c) (1982) (emphasis added). Subsection (f) directs the Commission to "maintain an ongoing review of . . . construction as it proceeds" — an activity at least arguably outside the Commission's jurisdiction when the facility is located in another state. The procedural statute governing certificate applications requires applicants "to publish a notice thereof once a week for four successive weeks in a daily newspaper of general circulation in the county where such facility is proposed to be constructed." N.C.G.S. § 62-110.1(a) (1982). We think it is unlikely that the legislature intended to notify residents of other states that a utility has applied for a North Carolina certificate of convenience and necessity.

At least one commentator has adopted the approach taken by this Court, and we have found none who disagrees. Professor Richard J. Pierce, Jr., of Tulane University has written that the

structure for ownership and operation of a multijurisdictional plant creates an allocation of regulatory authority very different from that applicable to the traditional single jurisdiction plant. First, because there is no federal requirement that new generating plants be certified, the state in which the

plant is to be located has the sole power to determine whether the plant can be built or completed.

Pierce, *The Regulatory Treatment of Mistakes in Retrospect: Canceled Plant and Excess Capacity*, 132 U. Pa. L. Rev. 497, 546 (1984).

It may be objected that our holding here tends to thwart the purpose of N.C.G.S. § 62-110.1, which is to prevent overbuilding of costly generating facilities. *State ex rel. Utilities Comm. v. High Rock Lake Assoc., Inc.*, 37 N.C. App. 138, 245 S.E. 2d 787, *cert. denied*, 295 N.C. 646, 248 S.E. 2d 257 (1978). The needs of North Carolina ratepayers may not be thoroughly considered by public officials in South Carolina or some other state, even though the facility in question is intended to generate electricity for delivery to this state as well as the state in which the plant is located.

The answer to this objection can be found in the statute requiring facilities to be "used and useful" in providing service to North Carolina customers before they can be included in a public utility's ratebase. N.C.G.S. § 62-133(b)(1). A generating station that constitutes excess capacity within a utility's North Carolina delivery system may not be included in the company's ratebase merely because some other state issued a certificate of convenience and necessity for that plant. In addition, N.C.G.S. § 62-110.1(c) directs the Commission to confer with officials from other states and the federal government for the purpose of assessing the need for future generating facilities.

Having carefully considered each of appellants' arguments concerning the Commission's treatment of Duke's 12.5 percent ownership interest in Catawba Unit 1, we find that the Commission acted within the limits of its authority when it included Unit 1 in the company's ratebase.

IV.

[6]  Duke Power's application for a rate increase proposed that the company's ownership interest in all common plant associated with the Catawba Nuclear Station be included in Duke's ratebase along with Unit 1. Switching stations, waste treatment facilities, shops, laboratories, roads and parking lots — all of which are intended to serve both generating units at Catawba — are examples

of common plant. The Commission, in its order of 17 September 1985, included Duke's ownership interest in all of Catawba's common plant when it added Unit 1 to the company's ratebase.

The Public Staff, noting that Catawba Unit 2 was not yet operational at the time of Duke's application for a rate increase, contends that only half of the Catawba station's common plant should be associated with Unit 1. The other half, according to appellant, should be classified as construction work in progress, consistent with the Commission's treatment of Unit 2. Appellant apparently is concerned that inclusion of Catawba's entire common plant in Duke's ratebase at this time represents a *de facto* determination, based on no evidence whatsoever, that Unit 2 does not represent excess capacity.

As we stated earlier, property of a public utility may be included in the utility's ratebase when it is used and useful in providing service to the public in this state. N.C.G.S. § 62-133(b)(1). The Commission properly recognized that this principle controlled its decision with respect to this matter, and found that all—not half—of Duke's interest in the common plant associated with Catawba Nuclear Station was, at the appropriate time, used and useful in providing service to North Carolina ratepayers. The question for this Court, then, is whether the Commission's conclusion is adequately supported by the evidence. *See State ex rel. Utilities Comm. v. Duke Power Co.,* 305 N.C. 1, 287 S.E. 2d 786 (1982) (appellate review of Commission's decisions substantially circumscribed by provisions of N.C.G.S. § 62-94(b) ).

We think the evidence is sufficient to support the Commission's decision. Both Duke chairman Lee and William R. Stimart, a company vice-president, testified that all of the costs incurred for common plant are necessary for the safe and reliable operation of Catawba Unit 1. This testimony was uncontradicted. The Public Staff's witness, James G. Hoard, acknowledged on cross-examination that he was unable to specify any common facilities that are not necessary for operation of Unit 1, and that he was simply proposing that half the cost of common plant be excluded from Duke's ratebase. In addition, appellant admits in its brief that Catawba's common plant "is indivisible, [and] in that sense . . . necessary for the safe, reliable operation of Catawba Unit 1."

The Commission's action in this case need not, and should not, affect its determination of whether Catawba Unit 2 represents excess capacity. The Commission stated in its order that its treatment of Catawba's common plant "does not imply any prejudgment, one way or the other, of any issues that may arise in the future with reference to Catawba Unit 2."

We hold, therefore, that the Commission acted within its authority when it included in Duke's ratebase the company's ownership interest in all of Catawba's common plant. We express no opinion as to how this decision might be affected if the Commission finds that Unit 2 does indeed represent excess capacity.

## V.

As noted above, Duke Power financed construction of the Catawba Nuclear Station by selling portions of the facility to various municipal power agencies and cooperatives located in the Carolinas. The contracts covering these conveyances include: (1) an agreement with the North Carolina Municipal Power Agency #1 (NCMPA) dated 6 March 1978, granting NCMPA a 75 percent ownership interest in Catawba Unit 2; (2) an agreement with the Piedmont Municipal Power Agency (PMPA) dated 1 August 1980, granting PMPA a 25 percent interest in Unit 2; (3) an agreement with the North Carolina Electric Membership Corporation (NCEMC) dated 14 October 1980, granting NCEMC a 56.25 percent interest in Unit 1; (4) an agreement with the Saluda River Electric Cooperative, Inc. (Saluda) dated 14 October 1980, granting Saluda an 18.75 percent interest in Unit 1; (5) amendments dated 22 October 1982 to the agreement with PMPA; and (6) amendments dated 12 November 1982 to the agreement with NCMPA.[5] Each of the Catawba sales contracts includes a purchase agreement, an operating and fuel agreement, and an interconnection agreement. The purchase agreements state that Duke will continue to design and build Catawba and the purchasers will pay their pro rata share of the costs. The operating and fuel agreements provide that Duke will operate, maintain and fuel the plant to meet the system load. The interconnection agreements—

---

5. These agreements left Duke with a 25 percent interest in Catawba Unit 1. As noted earlier, *supra* note 1, for purposes of this rate case Duke is treated as if it has a 12.5 percent ownership interest in each of Catawba's two units.

which are at issue here — mandate certain reliability exchanges between the two Catawba units and between the Catawba station and Duke's McGuire Nuclear Station. In addition, the interconnection agreements provide that Duke will "buy back" a portion of the purchasers' Catawba capacity for a period of time.

Appellants challenge three aspects of the Catawba contracts. First, they contend that this Court must invalidate provisions that require Duke to buy back a portion of the Catawba capacity owned by each of the Catawba buyers. Second, appellants challenge the provisions setting up reliability exchanges between the two Catawba units and between the Catawba and McGuire stations. Third, appellants contend that Duke may not recover costs associated with the 1982 amendments to its contract with the North Carolina Municipal Power Agency #1.

### A.

[7] The Catawba buyers — NCMPA, PMPA, NCEMC and Saluda — have purchased, in effect, portions of the station's capacity. The buyers' need for this capacity will be minimal during the early years of the plant's operation. Duke Power therefore agreed to buy back, in gradually diminishing amounts, part of the capacity owned by the purchasing cooperatives and municipal power agencies. In the case of the municipalities, the buyback begins at 97 percent of the purchasers' Catawba capacity and declines to zero over a period of fifteen years. In the case of the cooperatives, the buyback begins at 100 percent of the purchasers' Catawba capacity and declines to zero over a period of ten years. These provisions collectively required Duke to buy back approximately 83.3 percent of Unit 1's capacity during the 12-month period beginning 1 September 1985.[6] This amount will decrease over the next 15 years. The Commission determined that the Catawba contracts were reasonably and prudently entered into by Duke, and found that Catawba Unit 1 is used and useful in providing electric utility service to North Carolina retail ratepayers. Duke therefore was allowed to recover as operating expenses approximately $150 million paid to the Catawba purchasers under the buyback provisions of the Catawba contracts.

---

6. Duke was entitled to 12.5 percent of Unit 1's capacity by virtue of its ownership interest in the Catawba Nuclear Station. The remaining 4.2 percent of Unit 1's capacity was retained by the Catawba buyers.

State ex rel. Utilities Comm. v. Eddleman

Appellants make three substantive arguments concerning why the buyback provisions must be invalidated. First, the Attorney General and City of Durham contend that Duke may not recover its buyback costs because Catawba Unit 1 represents excess capacity within the Duke system and therefore cannot be used and useful in providing electricity to North Carolina retail ratepayers. We have already rejected appellants' excess capacity argument and see no need to rehash it here.

Second, the Conservation Council of North Carolina and Wells Eddleman argue that the buyback provisions are not operating expenses within the meaning of N.C.G.S. § 62-133(b)(3) because they do not "play the role of actually supplying electricity." Appellants contend that the buybacks are really a repurchase of the Catawba units from the Catawba buyers. Appellants apparently are concerned about the ramifications of this argument, because they quickly add that this "repurchase" of Catawba units is not the kind of capital expenditure that can be included in Duke's ratebase. This is because the ratebase includes "the reasonable original costs of the *public utility's* property," N.C.G.S. § 62-133(b)(1), and not the cost of property belonging to some other entity.

We need not address the latter half of appellants' argument because we hold that the Commission properly classified Duke's buyback costs as operating expenses. "When a narrow construction of the operating expense element of a regulatory act would frustrate the purposes of the act . . . the term should be liberally interpreted and applied." *State ex rel. Utilities Comm. v. Edmisten,* 294 N.C. 598, 606, 242 S.E. 2d 862, 868 (1978). Appellants are technically correct in asserting that the buyback provisions do not supply Duke's retail customers with any electrical capacity that wasn't already in Duke's system. Power generated at Catawba remains in Duke's system until it is distributed. The buyback provisions do, however, establish Duke's right to use capacity owned by the Catawba buyers to meet the demands of the utility's retail ratepayers. Duke, in other words, purchases the right to exercise control over Catawba capacity from those who hold legal title to that capacity. The buyback provisions, in this sense, are no different from Duke's many other contractual obligations. Duke purchases power from the Catawba buyers in much the same way as it purchases items ranging from nuclear fuel to

paper clips. Costs associated with those purchases are routinely recouped as operating expenses, and we see no reason to treat the purchase of power under the buyback provisions differently.

Third, appellants argue that the price paid by Duke for purchased power under the buyback agreements is unreasonable. Appellants complain, for example, that the cost of purchased power under the buyback agreements is about 8 cents per kilowatt hour (KWH), even though during the test period utilities could purchase power at rates as low as 2.1 cents per KWH. Duke responds that the low figures cited by appellants represent prices paid for short-term purchases and nonfirm capacity, not reliable base load capacity. Catawba, in contrast, will operate as a base load plant on Duke's system for approximately 40 years.

As we mentioned earlier, this Court's function under N.C.G.S. § 62-94 is to determine whether there is sufficient evidence to support the findings and conclusions of the Commission; we are not here to second-guess those findings and conclusions. "The Commission, not the courts, has been given the authority to regulate the rates of public utilities." *State ex rel. Utilities Comm. v. Thornburg*, 316 N.C. 238, 242, 342 S.E. 2d 28, 31 (1986). An order of the Commission

> will not be disturbed if upon consideration of the entire record we find the decision is not affected by error of law and the facts found by the Commission are supported by competent, material and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn.

*State ex rel. Utilities Comm. v. Carolina Utilities Customers Assoc., Inc.*, 314 N.C. 171, 179-80, 333 S.E. 2d 259, 265 (1985).

We also note that the buyback provisions of the Catawba contracts cannot be viewed in isolation; like the exchange agreements approved in Duke's last general rate case, they are "an inseparable part of the Catawba Sale Agreements." *Id.* at 183, 333 S.E. 2d at 267. Thus, the reasonableness of the buyback provisions cannot be determined without reference to the reasonableness of the Catawba contracts as a whole.

The Commission found that the Catawba contracts, as a whole, "have resulted in the cost of electricity to the Company's

State ex rel. Utilities Comm. v. Eddleman

North Carolina retail ratepayers being substantially lower than the cost of electricity would have been if Duke had itself financed the entire. plant." This finding, if supported by the evidence, strongly supports the Commission's conclusion that the Catawba contracts — including the buyback provisions — are reasonable and prudent, and that Duke's purchased power costs are therefore recoverable as operating expenses.

Witnesses for Duke testified that the Catawba sales agreements were, in effect, a financing tool that enabled Duke to complete construction of the Catawba station at a time when the company was in financial difficulty. The purchasing municipalities and cooperatives had access to relatively low-cost financing that was not available to Duke. If they, rather than Duke, were the principal owners of Catawba, the plant could be financed on terms favorable to both Duke and its retail ratepayers. The municipalities and cooperatives recognized, however, that they would not need large amounts of new capacity during the early years of Catawba's useful life. Thus, the buyback provisions at issue here were an important element of the agreements between Duke and the Catawba purchasers, because the buybacks enabled the purchasers to gradually assume their interest in Catawba over a period of ten to fifteen years.

Duke witnesses Lee and Stimart testified that the Catawba sales enabled the company to avoid expenses associated with the issuance of preferred stock and the assumption of substantial long-term debt. These savings were realized during the period from 1978 to 1984, when interest rates were very high. Lee stated that the Catawba sales will save North Carolina retail ratepayers approximately $28 million a year compared to what they would have had to pay if Duke had financed the plant itself. The Commission, based on this evidence, concluded that the Catawba sales agreements have helped minimize Duke's embedded cost of debt and preferred stock and have resulted in substantial benefits to North Carolina retail ratepayers.[7]

7. Wells Eddleman argues that Duke's admitted inability to finance Catawba itself means that any "savings" realized as a result of the Catawba sales — and the financing arrangements they made possible — are illusory. In other words, if there had been no sale of Catawba to Duke's wholesale customers the station would never have been built. Duke's North Carolina retail customers therefore would be

The Commission also concluded that ratepayers will benefit from a shift of high-cost Catawba capacity from Duke to the purchasing municipalities and cooperatives during the next several years. Catawba is the most expensive capacity on Duke's system. Duke vice-president Stimart testified that under the sales agreements, the Catawba purchasers retain a greater portion of Catawba's capacity than they would have paid for had they remained wholesale customers of Duke. Moreover, the purchasers' retained Catawba capacity gradually increases over the period of the buybacks. Stimart testified that this will result in savings to retail ratepayers in the hundreds of millions of dollars through the rest of this century.

We hold that the Commission properly found that the Catawba sales agreements, as a whole, were reasonably and prudently entered into by Duke as a means of financing completion of the Catawba Nuclear Station. The evidence supports the Commission's finding that financing charges have been minimized as a result of the Catawba sales, and that these savings will benefit retail ratepayers. The buyback provisions of the Catawba contracts were an integral and inseparable part of the total agreement package, and cannot be viewed in isolation. The Commission found that the price paid by Duke for purchased power under the buyback provisions is reasonable, and calculated the rates allowed Duke in this case accordingly. Rates fixed by the Commission are deemed prima facie just and reasonable. N.C.G.S. § 62-94(e) (1982). The party attacking the rates established by the Commission bears the burden of proving their impropriety. *State ex rel. Utilities Comm. v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786. Appellants have not met that burden here, and we therefore affirm the Commission's ratemaking treatment of the buyback provisions.

paying less than they are required to pay under the Catawba contracts—not, as the Commission contends, more.

Duke's retail customers might also be freezing in the dark. The Commission has determined that Catawba Unit 1 is used and useful in providing electric utility service to retail ratepayers in North Carolina, and that it does not represent excess generating capacity within Duke's system. Thus, we can infer that when Duke decided to complete Catawba, some method of either producing power or reducing demand was needed in order to prevent future shortages. Simply doing nothing was not an option. It is therefore not a reasonable basis for comparison.

B.

[8]   The so-called "precommercial McGuire reliability exchange" provisions of the Catawba contracts give the Catawba purchasers the right to receive power from Duke's McGuire Nuclear Station at very low rates prior to the completion of Catawba Unit 2. The price paid by the Catawba buyers for this power reflects Duke's actual production cost, but does not include any charge for the capital costs of the McGuire Station. Various intervenors in this case proposed adjustments that would remove from Duke's rate-base and operating expenses a portion of the McGuire Nuclear Station equal to the percentage of that station's output sold to the Catawba purchasers. Intervenors argued that the adjustment was required because this portion of McGuire was serving the Catawba buyers and not North Carolina retail ratepayers.

A similar if not identical claim was made in Duke's 1984 general rate case, Docket No. E-7, Sub 373. In that case the Commission found that the entire McGuire Nuclear Station was used and useful to North Carolina retail ratepayers, and this Court affirmed. *State ex rel. Utilities Comm. v. Carolina Utilities Customers Assoc., Inc.*, 314 N.C. 171, 333 S.E. 2d 259.

In the present case, Duke chairman Lee testified that the reliability exchange provisions of the Catawba contracts were a necessary part of the sale, insisted upon by the purchasers. Duke's witnesses also pointed out that the exchange provisions in the contracts work both ways; once the Catawba station is completed, Duke will be entitled to receive power from Catawba in the event of an outage at McGuire. The exchange provisions thus tend, in the long run, to even out the effects of outages at both Catawba and McGuire, thereby providing stability to all parties, including Duke's retail customers. In addition, because McGuire is older than Catawba, it probably will be retired first. If so, benefits of the reliability exchange will then flow exclusively to Duke's retail customers.

Based on this evidence, the Commission again found that the entire McGuire station is used and useful. The Commission stated:

No party has presented any facts which would cause the Commission to change its opinion with respect to the precommercial McGuire reliability exchange. In fact, the evidence in

this case is even more compelling. . . . Duke presented over-whelming evidence in this case as to the benefits of the Catawba Sale Agreements with which the Commission has agreed. It clearly would be inequitable to pass on these benefits to the North Carolina retail ratepayers without also requiring the North Carolina retail ratepayers to pay the costs associated with the Catawba Sale Agreements. In addi-tion . . . the McGuire reliability exchange is itself a fair shar-ing of costs which will be beneficial to the North Carolina retail ratepayers as well as to the Catawba Purchasers and their customers, who also include retail ratepayers in North Carolina. Finally, the Commission believes that consistency in regulation is important and should not be abandoned except for solid and legitimate reasons.

Appellants' argument appears to be that they did a better job of countering Duke's evidence in this case than they did in the 1984 rate case, and therefore our decision with respect to the reliability exchanges ought to be different this time. We are not persuaded. The reasons for our affirmance of the Commission's decision in the earlier case still exist. The precommercial McGuire reliability exchange provisions are an inseparable part of the Catawba sales agreements. *Carolina Utilities Customers Assoc.,* 314 N.C. at 183, 333 S.E. 2d at 267. We have already determined with respect to the buyback provisions that the Commission could properly find that the Catawba contracts, on balance, were benefi-cial to North Carolina retail ratepayers. We hold, in sum, that the Commission's inclusion of the entire McGuire Nuclear Station in Duke's ratebase is supported by "competent, material and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn." *Id.* at 179-80, 333 S.E. 2d at 265.

C.

[9] NCMPA agreed to purchase 75 percent of Catawba Unit 2 in March 1978, and the sale was closed in December of that year. At the time of the closing, the buyback provisions of Duke's contract with NCMPA stated that Duke would buy back the municipalities' Catawba capacity in amounts ranging from 50 percent the first year to zero percent by the end of the fifteenth year. The reliability exchange provisions of the same contract stated that

NCMPA would be entitled to receive power from the McGuire Nuclear Station if commercial operation of either Catawba unit was delayed more than a year from the dates specified in the contract. When Duke and NCMPA reached agreement in 1978 they expected Unit 1 to begin commercial operation in July 1981; thus, the date on which NCMPA could "trigger" its right to McGuire power was 1 July 1982.[8] The trigger date for Unit 2 was 1 January 1984.

In August 1980, PMPA agreed to purchase the remaining 25 percent of Catawba Unit 2 on terms essentially similar to those previously accepted by NCMPA, except that the reliability exchange trigger date for Unit 1 was set at 1 July 1983. Litigation in the South Carolina courts then delayed the closing of this sale. This litigation was resolved favorably to Duke and PMPA in early 1982, but PMPA still refused to close. In June 1982 a study conducted by PMPA concluded that purchase of a portion of the Catawba Nuclear Station under the terms of the original agreement was no longer feasible because of changes in interest rates and capital market conditions.

Duke, once again in dire financial straits, considered the sale to PMPA to be an "absolute financial necessity" and agreed to sweeten the pot. Specifically, Duke agreed to buy back an extra 47 percent of PMPA's Catawba capacity in the first year of the contract, plus an additional 50 percent of PMPA's capacity in each of the succeeding nine years. In return, PMPA agreed to delay its reliability exchange trigger dates to 1 January 1984 for Unit 1 and 1 July 1986 for Unit 2.[9] The agreement between Duke and PMPA was signed in October 1982, but closing was again delayed —this time until December 1984—by litigation in the South Carolina courts.

Meanwhile, in November 1982, Duke offered NCMPA the increased buyback it had just negotiated with PMPA. This amend-

---

8. NCMPA apparently elected not to trigger its right to receive McGuire power on 1 July 1982, but intended to do so on 1 January 1983. As explained below, Duke's desire to delay this trigger date was a substantial factor in the company's decision to amend its contract with NCMPA in November 1982.

9. Duke witness Lee testified that this delay in the trigger dates did not equal the cost of the increased buyback, but was an attempt on the part of the company to obtain maximum benefit for its retail ratepayers.

ment, which increased Duke's costs by approximately $250 million, was offered pursuant to a "most favored nation" clause in Duke's original agreement with NCMPA. The clause provides:

> If Duke enters into an interconnection agreement with the South Carolina Municipal Systems [PMPA] and/or any other entity relating to the sale to such entity of an ownership interest in Catawba Nuclear Station on more favorable terms than those contained in this Agreement, Duke will make such more favorable terms available to NCMPA provided NCMPA agrees to all the terms and conditions in such agreement relating to the net monetary benefits thereunder and the respective risks undertaken by the parties to that agreement.

NCMPA readily agreed to the increased buyback offered by Duke. In return, NCMPA agreed to delay the reliability exchange trigger dates in its contract to 1 July 1983 for Unit 1 and 1 January 1986 for Unit 2.

The Utilities Commission, in allowing Duke to recover the cost of its 1982 amendments to the NCMPA contract, found that

> [t]he contracts entered into by Duke Power Company to sell a major portion of the Catawba Nuclear Station to [NCMPA, PMPA, NCEMC and Saluda] . . . *and all amendments thereto* . . . are reasonable and prudent. These contracts collectively have resulted in the cost of electricity to the Company's North Carolina retail ratepayers being substantially lower than the cost of electricity would have been if Duke had itself financed the entire plant. (Emphasis added.)

The most favored nation clause in Duke's original contract with NCMPA was found to be an "essential part" of the overall agreement, and the Commission declined to view it in isolation.

The Public Staff contends that the Commission erred when it concluded that Duke acted reasonably and prudently in amending its contract with NCMPA in November 1982. Specifically, appellant argues that the amendments were not compelled by the most favored nation clause in Duke's original contract with NCMPA. This is because (1) the agreement with PMPA was not

closed until December 1984, and (2) by the time the PMPA sale was closed, NCMPA could not have satisfied the condition precedent in the most favored nation clause.[10]

This Court's function on appeal is *not* to determine whether, as a matter of law, the 1982 amendments to Duke's contract with NCMPA were legally mandated by the most favored nation clause. Instead, we must examine the action taken by the Utilities Commission to see if its findings and conclusions with respect to this matter — i.e., that Duke acted reasonably and prudently in amending the contract — are supported by "competent, material and substantial evidence in view of the entire record." N.C.G.S. § 62-94(b)(5). Legal interpretations of the most favored nation clause, in other words, are relevant only insofar as they bear upon whether Duke made a reasonable and prudent business judgment when it amended its contract with NCMPA. *Cf. State ex rel. Utilities Comm. v. General Telephone Co.*, 281 N.C. 318, 345, 189 S.E. 2d 705, 722 ("the management . . . of a public utility . . . rests with its board of directors in the absence of clear mismanagement or abuse of discretion").

As the Commission noted in its order of 17 September 1985, it is obvious that the most favored nation clause was not included in the original agreement between Duke and NCMPA for Duke's benefit. Duke witness Lee testified that NCMPA had insisted on the provision. Lee's testimony was corroborated by James Horwood, an attorney who represented NCMPA in the negotiations. Horwood stated that the most favored nation clause was important to NCMPA because of its economic value and because NCMPA would have been placed in a politically untenable position if another power agency obtained a better deal from Duke. We think this evidence is sufficient to support the Commission's finding that the clause in question was an "essential part" of Duke's original contract with NCMPA. We have, of course, already approved the Commission's finding that the Catawba sales agreements, as a whole, were reasonably and prudently entered into by Duke.

---

10. At least one of appellant's other arguments has been discussed elsewhere in this opinion. The Public Staff, along with Wells Eddleman, argues that any "savings" associated with the Catawba contracts are illusory because without the contracts Catawba never would have been built. This argument was considered and rejected in note 7, *supra.*

Duke amended its contract with NCMPA in November 1982, even though the deal with PMPA was not closed until December 1984. Duke witness Lee testified that he had been advised that the most favored nation clause in the company's contract with NCMPA did not require Duke to offer the amendment until PMPA closed. Duke chose to offer the amendment early, however, because NCMPA planned to trigger its right to receive cheap McGuire power on 1 January 1983. By amending the contract early, Duke was able to get the reliability exchange trigger dates pushed back. In addition, witness Lee testified that he expected the PMPA sale to be closed in early 1983, and could not have foreseen the lengthy delay caused by additional litigation in South Carolina.

Witness Horwood, counsel for NCMPA, testified that in his opinion the most favored nation clause required Duke to offer the PMPA terms to NCMPA as soon as the agreement with PMPA was signed, and not when the closing occurred. He stated that if Duke had not done so he would have recommended that NCMPA take legal action to enforce the provision.

The Commission found that Duke's renegotiation of the NCMPA contract in November was prudent and in the best interests of North Carolina retail ratepayers.

> While the language of the most favored nation clause is such that reasonable men may differ as to whether Duke was required to offer the amendments in 1982 or could have waited until after PMPA closed, it is clear that Duke would have been required to offer the amendments at some point in time. Duke, by offering the amendments when it did, acted in the best interests of the Company's North Carolina retail ratepayers by diminishing the period of time the precommercial McGuire reliability exchange was in effect. Moreover, as witness Lee testified, when Duke renegotiated the Interconnection Agreement with NCMPA, Duke expected PMPA to close within a short period of time. This testimony, and the reasonableness of this assumption, was uncontradicted. The renegotiation in November 1982, rather than in early 1983 when Duke expected PMPA to close, allowed Duke to avoid the triggering of the precommercial McGuire reliability exchange. Therefore, Duke's objective in renegotiating the

amendments with NCMPA in November 1982 was in the retail ratepayers' best interests and was reasonable and prudent.

We hold that the evidence is more than sufficient to support the Commission's conclusion. Witness Lee testified that Duke expected to close the sale to PMPA in early 1983. As the Commission noted, Lee's testimony, and the reasonableness of this assumption, were uncontradicted. Instead of waiting for the closing, Duke took action to prevent NCMPA from triggering its right to receive cheap power under the precommercial McGuire reliability exchange. Assuming for the sake of argument that Duke was not legally required to amend the NCMPA contract until the PMPA closing occurred, we think it was eminently reasonable for Duke to go ahead with the amendment in November 1982. Indeed, it probably would have been unreasonable to wait until the reliability exchange trigger date had passed.

The Public Staff contends that Duke would not have been required to amend its contract with NCMPA if company officials had waited until December 1984 to make the offer. This is because NCMPA would no longer have been able to accept—as required by the most favored nation clause—risks and benefits equal to those undertaken and enjoyed by the parties to the PMPA agreement. Specifically, NCMPA could not have agreed to delay the reliability exchange trigger date for Catawba Unit 1 because the exchange would have been triggered on 1 January 1983.

The Commission found, and we agree, that triggering of the McGuire exchange on the original schedule would not have prevented the most favored nation clause from taking effect. The clear intent of the most favored nation clause, as noted by the Commission, is to equalize the net monetary benefits to NCMPA and, in this case, PMPA. If necessary, an offset could have been implemented to reflect benefits received by NCMPA under the reliability exchange provisions of its original contract with Duke. Thus, Duke could have reasonably believed in November 1982 that the most favored nation clause would mandate amendment of the NCMPA contract when the PMPA sale was closed, as Duke then expected, in early 1983.

The Public Staff also points out that NCMPA did not agree to the same reliability exchange trigger dates accepted by PMPA. It does not necessarily follow, however, that the Commission erred when it determined that Duke acted reasonably and prudently when it amended the NCMPA contract in November 1982. The most favored nation clause does not require what Duke aptly terms "a slavish mirroring of all terms contained in another party's contract." When Duke and NCMPA negotiated the amendment in November 1982, Duke took the position that the most favored nation clause required NCMPA to accept the same trigger date provisions negotiated by PMPA. NCMPA, on the other hand, insisted that it was merely required to accept delays equal to the difference between the trigger dates in PMPA's revised agreement with Duke and those in the 1980 PMPA agreement, which was never closed. Duke and NCMPA eventually compromised and reached an agreement that the Commission characterized as being "somewhere in the middle between their respective positions." In light of the disagreement as to what the most favored nation clause required, the Commission concluded—and we agree—that Duke acted reasonably in its negotiations with NCMPA.

Appellant further argues that any benefits flowing from the delayed trigger dates accrued to Duke stockholders, and not to North Carolina retail ratepayers. As the Commission noted, this contention overlooks the fact that Duke, if it had not been able to postpone the exchange, could have filed for rate relief to recoup any costs it incurred. *See State ex rel. Utilities Commission v. Carolina Utilities Customers Association*, 314 N.C. 171, 333 S.E. 2d 259.

Finally, the Public Staff argues that this Court should declare the most favored nation clause in Duke's contract with NCMPA void as against public policy because it permits Duke's cost of doing business to escalate indefinitely. The United States Supreme Court has ruled that a state legislature may pass a statute invalidating indefinite gas price escalation clauses. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 74 L.Ed. 2d 569 (1983). It would be something else again for this Court to void a provision that the Commission found on supporting evidence to be reasonable, and we decline to do so.

State ex rel. Utilities Comm. v. Eddleman

In sum, the Commission properly found that Duke Power acted in a reasonable and prudent manner when it amended its contract with NCMPA in November 1982. Therefore, the Commission acted within the scope of its authority when it permitted Duke to recover costs associated with those amendments.

VI.

[10] The Catawba sales agreements provide that Duke Power will buy back capacity and energy from the Catawba purchasers in declining amounts over a period of years. Payments by Duke under the buyback plan have three components: capital costs, operating and maintenance (O&M) costs, and fuel costs. In its application for a rate increase and in testimony before the Commission, Duke proposed that it be allowed to recover these costs in current rates as the payments are made. The Public Staff recommended levelizing capital and O&M costs in order to stabilize this element of expense over time and to avoid "rate shock" to present customers.

The Commission, in its order of 17 September 1985, adopted what might be characterized as a compromise position:

> Since the Catawba sale is in reality a financing mechanism, it makes sense to levelize the Company's capacity capital costs and give rate stability for the period of the buy-back. . . . [S]uch levelization will serve to better align present and future customer payment responsibilities with the benefits which flow from the buy-back arrangements over the lives of those contracts. . . .

> Thus, the Commission concludes the purchased power capacity capital costs from Catawba Unit 1 should be reflected in Duke's cost of service levelized over the lives of the applicable contracts. . . . Annual demand O&M and fuel charges, which are by their very nature more variable than capacity capital charges, will not be levelized, but will be included in the cost of service as proposed by Duke.

The Commission's decision to levelize capacity capital costs is not challenged in this appeal. The Public Staff, however, contends that the Commission improperly refused to levelize the O&M component of the buyback costs. According to appellant, "there was not a shred of testimony" to support the Commission's conclusion

that O&M costs are more variable than capital costs, and therefore the Commission's refusal to levelize the O&M component was arbitrary, capricious, and an abuse of discretion.

We disagree. The Commission has been given the authority and responsibility for setting rates for public utilities. In doing so, it must have room to exercise its discretion and judgment. There is, in fact, little if anything in the record to support the Commission's conclusion that O&M costs are more variable than capital costs. Common sense, however, leads us to believe that the conclusion is a reasonable one. Operating and maintenance costs appear to be more like fuel costs than capital costs, in that they are likely to fluctuate and therefore are difficult to levelize. Capital costs, in contrast, can be more precisely ascertained because they are in the nature of principal and interest payments under a mortgage. In any event, there is nothing in the record to suggest that the Commission's conclusion with respect to the variability of O&M costs is wrong. Appellant claims that it "could advance extensive and well grounded substantive reasons why the Commission's conclusion is incorrect," but no such reasons have been offered. We hold, therefore, that the Public Staff has failed to meet its burden of demonstrating that the Commission's decision not to levelize O&M costs was unjust or unreasonable. N.C.G.S. § 62-94(e).

Under the Commission's levelization plan, Duke's capital costs under the buyback plan will not be fully reflected in the rates approved in this case. Consequently, the Commission ruled that the "difference between the amount included in purchased power expense and Duke's actual capacity payments should be placed in a deferred account and should accrue carrying costs at the Company's existing AFUDC rates." Appellant Wells Eddleman contends that "only plant under construction collects Allowance for Funds Used During Construction," and therefore the Commission cannot grant any AFUDC for Catawba Unit 1 because it is now in commercial operation.

We need only point out that the Commission has not granted Duke an AFUDC *as such* in this case, but has merely permitted the recovery of "carrying costs" computed by reference to the rate established for AFUDC purposes. Under the levelization plan, Duke's present buyback costs are higher than the corre-

sponding amount it is authorized to collect in current rates. The difference is money being provided by Duke. As Duke notes in its brief, "[t]he carrying charge allowed by the Commission recognizes that there is a cost involved in providing these funds." We therefore decline to disturb the Commission's order with respect to this matter.

## VII.

[11] Duke Power began constructing its Perkins and Cherokee nuclear stations in the mid-1970s. Within a few years the rate of increase in demand for electricity dropped markedly, and Duke cancelled both stations at considerable expense. In these proceedings the Utilities Commission found that (1) Duke's decisions to build the Perkins and Cherokee stations were prudent when made; (2) the decisions to cancel these plants were likewise prudent; and (3) under these circumstances it is reasonable and necessary to allow the company to recover the sunk costs in a fair and equitable manner. The question presented in this appeal by the Attorney General, the City of Durham and Wells Eddleman is whether the Commission properly allowed Duke Power to recover costs associated with its abandoned Perkins and Cherokee nuclear stations.

The Court is evenly divided with respect to this matter, Justice Meyer not participating. Therefore, following the uniform practice of this Court, the decision of the Utilities Commission is affirmed, not as precedent but as the decision in this case. *Lynch v. Hazelwood*, 312 N.C. 619, 324 S.E. 2d 224 (1985).

## VIII.

[12] Dr. Ben Johnson, the Public Staff's cost of capital witness in these proceedings, recommended that Duke receive an allowed return on equity of 14 percent. Duke's witness, Dr. Charles Olson, recommended a return of 15 to 15.5 percent. The Commission gave Duke an allowed return on equity of 14.9 percent.

The Public Staff contends on appeal that the record, considered as a whole, does not support the Commission's judgment. According to appellant, "the record as a whole demonstrates that the Commission gave Duke a return calculated appropriately for a utility incurring the risks normally incident to an ordinary electric utility, while simultaneously insulating Duke from all such

risks," especially with respect to Duke's 1982 amendments to its contract with NCMPA.

We do not believe the Commission has insulated Duke from all risks associated with the operation of a public utility; thus, appellant's argument falls of its own weight. Moreover, we have held that the Commission may reject uncontradicted testimony concerning what constitutes a reasonable rate of return without even stating its reasons. *State ex rel. Utilities Comm. v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786. Here the Commission properly exercised its discretion by setting a rate of return within the range of those recommended by witnesses for Duke and the Public Staff.

The Attorney General, the City of Durham and the Public Staff also contend that the Commission erred in finding that Duke's capital structure included a common equity component of 45.52 percent. We find no error in this essentially factual determination. In its application for a rate increase Duke stated that its capital structure as of 30 June 1984, the end of the test year, consisted of 44.24 percent long-term debt, 11.55 percent preferred stock, and 44.21 percent common equity. These figures were updated through 31 May 1985 at the hearing to reflect a common equity component of 45.73 percent. Witnesses for Duke testified that it was necessary to update the company's capital structure because the rate of return recommended by Duke and other parties was based on the risk inherent in Duke's actual capital structure at the time of the hearing, and not on the somewhat higher risk factors present at the end of the test period.

The Commission found that Duke's 31 May 1985 figure, with one modification, was reasonable and appropriate for use in this case.[11] We agree. N.C.G.S. § 62-133(c) permits the Commission to consider "such relevant, material and competent evidence as may be offered by any party to the proceeding tending to show actual changes in costs, revenues or the cost of a public utility's property used and useful . . . which is based upon circumstances and events occurring up to the time the hearing is closed." Evidence

---

11. The Commission agreed with Public Staff witness Johnson that the capital structure should be adjusted to exclude Duke's equity investment of approximately $24 million in two nonregulated subsidiaries, Cresent Land & Timber Corporation and Mill Power Supply Company.

of a change in Duke's common equity ratio was therefore admissible and provided an adequate basis for the Commission's decision with respect to this question.

## IX.

[13] Evidence before the Commission indicated that Duke's residential class of customers pays less than its cost of service, while general service and industrial customers pay more than their cost of service. A uniform, across-the-board rate increase would tend to exacerbate this disparity. In an attempt to narrow the disparity and keep it within what the Commission has called a "10 percent band of reasonableness," Duke proposed that the dollar allowance it received because of increased availability of general and industrial time-of-use rates be allocated to all customer classes, including residential. This would have the effect of shifting a portion of Duke's revenue requirement from the general and industrial customer classes to the residential class, thereby narrowing the disparity between their respective rates of return. The Public Staff recommended an alternative method of narrowing the gap.

The Commission adopted Duke's proposal and explained its decision in the following terms: "The Commission declines to adopt the Public Staff's recommendation as it has concluded that Duke's proposal . . . results in a longer and more measured stride toward equalizing the respective class rates of return."

The Public Staff contends that the Commission's rationale for its decision is "just plain wrong." In support of this argument appellant has provided the Court with a sheet full of numbers and an unexplained assertion that these numbers prove that the Public Staff's proposal narrows the disparity in rates of return to a greater degree than Duke's proposal. Duke, in response, presents us with an exhaustive challenge to the accuracy of the Public Staff's calculations.

We will not pass judgment on which party in this case employs the better mathematicians. The Utilities Commission, not this Court, is the finder of fact in this proceeding. *State ex rel. Utilities Comm. v. Carolina Coach Co.*, 260 N.C. 43, 132 S.E. 2d 249 (1963); *State ex rel. Utilities Comm. v. Haywood Electric Membership Corp.*, 260 N.C. 59, 131 S.E. 2d 865. Findings of fact

made by the Commission are prima facie just and reasonable on appeal. N.C.G.S. § 62-94(e). The burden of showing the impropriety of rates established by the Commission lies with the party alleging such error. *State ex rel. Utilities Comm. v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786. Appellant has not met that burden here.

X.

[14] Appellants, in their final assignments of error, challenge the Commission's decisions concerning several federal income tax matters. First, the Attorney General contends that the Commission erred by setting rates based on expense levels which did not reflect the proper allocation of certain investment tax credits. The tax credit at issue here—the Job Development Investment Tax Credit—is designed to stimulate employment by encouraging investment in new plants and equipment. It allows taxpayer utilities to reduce their tax liability by a percentage of their investment in qualifying property purchased during the tax year. *State ex rel. Utilities Comm. v. Carolina Telephone and Telegraph Co.*, 61 N.C. App. 42, 300 S.E. 2d 395 (1983).

When setting rates for a public utility, the Commission takes into consideration the utility's federal tax liability. This liability is calculated without deducting the investment tax credit at issue here. Therefore, the credit—if it is ultimately allowed—generates "capital" from ratepayers because funds ostensibly collected for the payment of federal income taxes are never actually paid out by the utility. *See id.*

The Attorney General argues that the Commission should treat the "capital" generated by the Job Development Investment Tax Credit as if it were proportionately contributed by each component of Duke's capital structure. Thus, a portion of the credit would be attributed to debt, a portion to preferred stock, and a portion to common equity. The portion of the credit attributed to Duke's bondholders, multiplied by the cost of that debt, would equal the amount of imputed interest expense related to the credit. Appellant would then deduct this imputed interest expense from Duke's test year level of income tax expense for ratemaking purposes. This rather complicated procedure, known as "interest synchronization," is intended to distribute the

benefits of the investment tax credit between the utility and its ratepayers.

At the hearings in this docket the Attorney General presented evidence that interest synchronization had been viewed favorably by the Internal Revenue Service in a proposed rulemaking issued 21 June 1985. 50 Fed. Reg. 26,385 (1985). Duke, in response, argued that the proposed rulemaking might never become final; consequently, interest synchronization could put the company's entire tax credit at risk if the IRS ultimately determined that the procedure would not be allowed. The Commission, in its 17 September 1985 order, agreed with Duke:

> Attorney General witness Wilson reduces income taxes in cost of service by imputing an interest deduction based on investment tax credits in the income tax calculation. His support for this adjustment is a *proposed* rulemaking issued June 21, 1985, by the IRS stating that this adjustment to tax expense will not be a violation of the IRS normalization rules for investment tax credits.

> [Duke] witness Stimart testified that this rulemaking is just a proposal at this time that may or may not be adopted by the IRS, and that if the Commission accepts Dr. Wilson's adjustment and this rulemaking is not adopted by the IRS, the company will be in violation of the IRS normalization rules and will be subject to the loss of investment tax credits, thereby increasing cost of service.

> The Commission finds that the company's filing on this matter is consistent with our past decisions and with . . . *State ex rel. Utilities Comm. v. Carolina Telephone Co.*, 61 N.C. App. 42 (1983). Therefore the Commission rejects the adjustment proposed by Dr. Wilson.

Appellant contends that the Commission's decision with respect to this matter was affected by error of law and was arbitrary and capricious. We disagree. At the time it issued its order in this case, the Commission had ample reason to reject interest synchronization. Our Court of Appeals had earlier determined that such an adjustment would violate sections of the Internal Revenue Code that limited the extent to which benefits of the tax credit could be "flowed through" to ratepayers.

*Carolina Telephone*, 61 N.C. App. at 49, 300 S.E. 2d at 399. Moreover, there was no assurance that the proposed rulemaking concerning interest synchronization would ever become final. The Commission therefore acted within its discretion and in conformance with applicable judicial precedent when it decided not to put Duke's receipt of the tax credit at risk by adopting the Attorney General's proposal for interest synchronization.

We note, however, that final regulations concerning the ratemaking treatment of investment tax credits were issued by the Internal Revenue Service after the Commission's decision in this case. 51 Fed. Reg. 18,775 (1986). These regulations "clarify that interest synchronization is permitted under a ratable flow-through method of accounting." *Id.* at 18,776. The Commission should take these regulations into account in future ratemaking proceedings, consistent with its responsibility to set utility rates as low as may be reasonably consistent with the requirements of due process. *State ex rel. Utilities Comm. v. Duke Power Co.*, 285 N.C. 377, 206 S.E. 2d 269 (1974).

[15]  Finally, the Public Staff contends that the Commission erred when it refused to seek certain private letter rulings from the IRS.[12] Appellant proposed various adjustments to the ratemaking treatment of accumulated deferred taxes and investment tax credits which were rejected by the Commission in its order of 17 September 1985. In its 17 October 1985 motion for reconsideration, the Public Staff requested that the Commission order Duke to seek private letter rulings from the IRS as to each issue, and pending these rulings to establish various deferred accounts, the balance of which would be refunded to ratepayers if the IRS ruled in favor of the Public Staff's position. The Commission denied appellant's motion for reconsideration, stating:

> The Commission has carefully considered the tax matters that are the subject of the proposed private letter rulings from the IRS. In order to gain proper perspective, it should be noted that these matters were extensively investigated and reviewed during the public hearings in this

12. The Attorney General makes an identical contention with respect to the Commission's treatment of the Job Development Investment Tax Credit. We reject this assignment of error for the reasons stated here.

docket. The Commission took great care and performed in-depth and prolonged analysis in determining the appropriate ratemaking treatment to be afforded these items. These determinations were set out in the Order of September 17, 1985, and were discussed therein. Based on the foregoing, and the reaffirmation that the decisions reached in the Order of September 17, 1985, were fair and reasonable to both Duke and its ratepayers, the Commission concludes that it would not be appropriate to order Duke to request the private letter rulings. Further, the Commission concludes that the requested deferred accounting treatment would be inappropriate and should be denied.

The Public Staff does not seek review of the merits of its proposed adjustments, but appeals only the Commission's refusal to order Duke to seek private letter rulings with respect to these matters. We hold that the Commission acted properly in this instance. The General Assembly has given the Commission, not this Court, the duty and power to establish public utility rates. *State ex rel. Utilities Comm. v. Westco Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487 (1966). The Commission's subjective judgment concerning the need for a private letter ruling will not be disturbed simply because this Court's subjective judgment might have been different. *See State ex rel. Utilities Comm. v. Virginia Electric & Power Co.*, 285 N.C. 398, 206 S.E. 2d 283 (1974). Whether to seek such a ruling is a matter within the Commission's discretion, and appellant has failed to show any abuse of that discretion.

The order of the Utilities Commission is

Affirmed.

Justice MEYER took no part in the consideration or decision of this case.